**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-0017 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENELM SHIRK, III | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a motion to suppress evidence filed by Defendant

Kenelm Shirk, III ("Shirk").  (Doc. 39.)  The motion seeks to suppress evidence in

three categories: (1) evidence seized from Shirk's vehicle; (2) statements and items

obtained by Chambersburg Hospital personnel; and (3) Shirk's statements to FBI

Special Agent Bruce Doupe.  For the following reasons, the court will grant in part

and deny in part Shirk's motion to suppress evidence.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A criminal complaint was filed against Shirk on January 27, 2021, charging

him with influencing, impeding, or retaliating against a federal official by

threatening or injuring a family member, in violation of 18 U.S.C. § 115(a)(1)(B).

(Doc. 1.)  By Indictment filed February 3, 2021, Shirk was charged with one count

of threatening to murder a United States official in violation of 18 U.S.C.

§ 115(a)(1)(B).  (Doc 11.)

1

On the evening of January 21, 2021, at around 7:12 p.m., Shirk's ex-wife Marsha Chamberlain ("Chamberlain") called 9-1-1 to report that Shirk made statements to her that he was going to kill Democratic Senators.  (Doc. 40, p. 6.)[1] She also reported that Shirk loaded firearms and ammunition into his vehicle before leaving the residence and that he would commit "suicide by cop" if met by police.  (*Id.*)  Approximately one hour later, a BOLO[2] was issued for Shirk.  (*Id.*) Soon thereafter, the PSP located Shirk at a Sheetz gas station in Franklin County, where he was taken into custody upon leaving the store.  (*Id.*)  Because Shirk was taken into custody, PSP towed his vehicle to their Chambersburg, Pennsylvania station and conducted an inventory search, during which they seized an assault rifle, a revolver, a pistol, and ammunition.  (*Id.* at 2–3.)

For background, pursuant to the Mental Health Procedures Act, when someone is taken into custody on an involuntary mental health commitment warrant ("302 warrant"), "[a] person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301(b) and in need of immediate treatment."  50 P.S. § 7302(b).  The Mental Health Procedures Act states that a

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[2] BOLO, or "be on the lookout," is a "[a] broadcast issued from a law enforcement agency to others, typically containing information about a wanted suspect, a person of interest, or a related vehicle."  BOLO, Wiktionary, https://en.wiktionary.org/wiki/BOLO

person may be subject to such involuntary emergency examination when they pose a clear and present danger of harm to others or to himself.  50 P.S. § 7301(a)(1).

After the PSP took Shirk into custody, they transported him to Chambersburg Hospital, where he was initially evaluated by ER personnel.  (Doc. 48, p. 40.)  Shirk was admitted to the emergency room as a 302 patient.  (*Id.*)  Records indicate that the original 302 warrant had not yet been received by Chambersburg Hospital at the time of admission and Shirk remained in the ER.  (*Id.*, pp. 70–71.)  According to hospital records, ER staff went into Shirk's room numerous times while he was there and Shirk made various statements to hospital staff members.  (*Id.*, pp. 40–64; 73–76.)  FBI Special Agent Bruce Doupe ("Special Agent Doupe") went to the hospital in the early morning on January 22, 2021 to interview Shirk and was escorted to his room.  (*Id.*, p. 55.)  Prior to the interview, Special Agent Doupe was told that Shirk was going to be discharged and released from the hospital.  (Doc. 48-1, p. 25.)  Special Agent Doupe interviewed Shirk in his room without advising him of his rights pursuant to *Miranda v Arizona*.  (*Id.*, p. 26.)

The original 302 warrant was hand delivered to a Registered Nurse ("RN") in the ER at about 10:00 a.m. on January 22, 2021 and was then given directly to a crisis worker for Shirk's psychological evaluation to be conducted.  (Doc. 48, p. 75.)  Approximately two hours later, Shirk was discharged after the evaluator

concluded that involuntary commitment was not warranted. (*Id.*, p. 33.) Shirk was then arrested by PSP and charged under Pennsylvania law with making terroristic threats. (Doc 49, ¶ 2.) This charge was withdrawn after Shirk was indicted in the present case. (*Id.* ¶ 5.)

On September 3, 2021, Shirk filed a motion to suppress evidence seized from his vehicle, the statements and records from Chambersburg Hospital personnel, and the statements he made during his interview with Special Agent Doupe, as well as a brief in support thereof. (Docs. 39, 40.) The Government filed a brief in opposition on October 13, 2021, along with supporting documentation. (Docs. 48, 48-1.) No reply brief was filed. A suppression hearing was held on December 7 and 8, 2021. Thus, this motion is ripe for review.

## FINDINGS OF FACT

During a two-day suppression hearing, the following witnesses testified on behalf of the Government: Officer Gregory Bender, Chief Brett Hopkins, Brenda Startoni, Trooper Jared Myers, Trooper Yoon Jang, RN Nina Chiaruttini, RN Autumn Furry, RN Michaela Chamberlain, Trooper Michael Garbacik, Trooper Lucas Hull, and Agent Doupe. Shirk testified on his own behalf. Based on a review of the testimony and exhibits introduced during the suppression hearing, the court makes the following findings of fact.

### A. 911 Call Through Detention at Sheetz[3]

Shirk and his ex-wife with whom he resided, Marsha Chamberlain, got into an argument on the evening of January 21, 2021.  Chamberlain left the house and called 911.  On January 21, 2021, at approximately 7:14 p.m., Officer Gregory Bender ("Officer Bender") from Cornwall Borough Police Department received a dispatch from Lebanon County advising that there was a domestic dispute at 1045 Belltower Drive in Lebanon, Pennsylvania, which was Shirk and Chamberlain's home.  (Tr.[4] at 6; Gov't Ex. 6, p. 16.)  The dispatcher told Officer Bender that there was a domestic dispute, that there were firearms involved, and that the complainant may have fled to a neighbor's house.  (Tr. at 7; Gov't Ex. 6, p. 16.)

When Officer Bender arrived, he spoke with Chamberlain, who stated that Shirk loaded firearms and ammunition in his vehicle; he was going to Virginia to visit his granddaughter first, then he would be going to Democratic Senators' houses in D.C. to kill them; he had their addresses; he had been planning this for a while and bought a new silver Subaru for this mission; he had been depressed lately; and he would not be returning, as he intended to commit suicide by cop.  (Tr. at 10–11; 13–14.)   At the time of Chamberlain's 911 call, she was not sure

---

[3] For the purpose of providing a clear explanation in this opinion, the court categorizes the factual findings by events rather than presenting them in chronological order.

[4] The court obtained a rough transcript of the two-day suppression hearing from the court reporter for the purpose of issuing this opinion as quickly as possible given that Shirk is detained pending trial.

whether Shirk was still at the residence, but when Bender arrived, the garage door was open and only Chamberlain's blue Honda was inside.  (*Id.* at 11.)  Officer Bender obtained Shirk's phone number from Chamberlain and provided the number to Chief Brett Hopkins.[5]  (*Id.* at 22.)

At the outset, Chief Hopkins pinged Shirk's phone, (i.e., obtained real-time tracking of Shirk via his cell phone) and issued a BOLO to law enforcement in a 150-mile radius to check on Shirk's well-being.  (*Id.* at 28; 45.)  The BOLO contained the following language:

> BOLO-USE CAUTION SUBJECT ARMED
>
> CORNWALL BORO POLICE DEPT IS LOOKING FOR A KENELM SHIRK III [. . .] PA OLN [. . . ] DESCRIBED AS A WHITE MALE 5 FT 8 200 LBS MOSTLY BALD UNK CLOTHING DESCRIPTION LEFT FROM HIS ADDRESS IN CORNWALL IN A 2020 SILVER SUBARU PA REG [. . .] SUBJECT IS REPORTED TO BE HEAVILY ARMED WITH MULTIPLE GUNS INCLUDING AR'S AND EXTENSIVE AMOUNTS OF AMMO BEFORE LEAVING THE RESIDENCE HE MADE THREATS TO KILL HIS WIFE AND MENTIONED HAVING THE HOME ADDRESSES OF DEMOCRATIC SENATORS MADE CLAIMS THAT HE WILL BE GOING TO VIRGINIA AND THEN DC TO KILL PEOPLE ALSO MADE STATEMENTS ABOUT WANTING SUICIDE BY COP THERE HAS BEEN A PING STARTED ON HIS PHONE ANY UNIT COMING IN CONTACT USE EXTREME CAUTION WITH SUBJECT AND ADVISE CORNWALL PD

(Gov't Ex. 14) (personal information redacted.)

---

[5] At the time of the incident, now-Chief Hopkins was a Sergeant with Cornwall Borough Police Department.

Chief Hopkins also contacted the Lebanon County District Attorney's Office about possible charges. (Tr. at 43–44.) An assistant district attorney advised Chief Hopkins that there were no criminal violations. (*Id.* at 44.) She also instructed Chief Hopkins to contact Lebanon County Crisis to pursue a possible 302 evaluation. (*Id.* at 44.) Chief Hopkins' contact with Crisis is detailed in section C below. After receiving locations for Shirk's phone from the ping, Chief Hopkins contacted PSP Chambersburg. (*Id.* at 27.) He was then notified that PSP troopers located Shirk at a Sheetz along Interstate 81 in Franklin County, Pennsylvania. (*Id.* at 27.)

Pennsylvania State Police Trooper Jared Myers ("Trooper Myers") was stationed at PSP Carlisle on January 21, 2021. (*Id.* at 67.) Trooper Myers identified Shirk's silver Subaru at Sheetz based on the license plate information contained in the BOLO. (*Id.* at 67–68.) According to the CAD[6] printout, this occurred at approximately 9:09 p.m. (Gov't Ex. 11, p. 4.) Trooper Myers located Shirk's vehicle at a gas pump and contacted other units who were assisting via radio. (Tr. at 68.) Trooper Myers obtained a photograph of Shirk to identify him. (*Id.*) Trooper Myers was in his vehicle on the side of the building watching for

---

[6] CAD stands for "computer-aided dispatch." (Tr. at 70.) The CAD report, Gov't Ex. 11, contains a printout of dispatch information, sometimes entered by the officers and sometimes by dispatchers, for the time period that PSP was dispatched to assist. (Tr. at 94–95.) Trooper Jang testified that the times listed in the CAD report are not always entirely accurate and may be off by several minutes. (Tr. at 95.) Based on this testimony, the court does not view the times stated in the CAD report as precise, but rather as ballpark time frames.

anyone approaching the vehicle when he saw Shirk exit the building.  (*Id.*)  Other

PSP troopers arrived at the location to assist.  As Shirk was exiting the Sheetz gas

station, officers approached him with their guns drawn.  (*Id.* at 72.)  Shirk was

instructed to get on the ground and put his hands behind his back.  (*Id.* at 69.)

Officers handcuffed Shirk and detained him "to prevent the opportunity for him to

be harmed or anyone else to be harmed."  (*Id.* at 75.)

    At this time, officers were determining whether they were authorized to

transport Shirk to a facility for a mental health evaluation.  (*Id.* at 77.)  Trooper

Myers testified that when they detained Shirk, he assumed that based on the

information he had at that time, Shirk would be subject to a 302 evaluation.  (*Id.*)

Shirk was not advised of his *Miranda* rights when he was initially taken into

custody or at any time thereafter.  (*Id.* at 70; 89.)

    Pennsylvania State Police Trooper Yoon Jang ("Trooper Jang") was also

stationed at PSP Carlisle on January 21, 2021.  (*Id.* at 79.)  Trooper Jang arrived at

Sheetz as Shirk was being detained and he believed that the 302 had been

authorized at that time.  (*Id.* at 80–81.)  At approximately 9:30 p.m., Shirk was put

into Trooper Jang's patrol car and they left Sheetz.  (*Id.* at 95–96.)

## B. Searches of Shirk's Vehicle

    Trooper Michael Garbacik ("Trooper Garbacik"), who was stationed at PSP

Chambersburg on January 21, 2021, testified that the PSP has a field regulation

setting forth a clearly established policy for inventory searches.  (Tr. at 200–202; *see* Gov't Ex. 12, pp. 7–10.)  The policy states that an inventory search shall be conducted when a vehicle is taken into custody through official action of the Department.  (Gov't Ex. 12, p. 8.)  The policy specifically includes circumstances under which the owner/agent of the vehicle is taken into custody.  (*Id.* at 9.)  According to Trooper Garbacik, the purpose of an inventory search is to secure items of value in the vehicle.  (Tr. at 202.)

After Shirk was taken into custody, the PSP arranged to have Shirk's Subaru towed to PSP Chambersburg.  (Gov't Ex. 11, p. 3.)  At approximately 12:30 a.m., Trooper Garbacik conducted an inventory search of Shirk's vehicle.  (Gov't Ex. 12.)  Firearms and firearm accessories were removed from the vehicle and inventoried.  (*Id.*)

In March 2021, Special Agent Doupe obtained a search warrant for Shirk's vehicle.  (Tr. at 277.)  Numerous additional items were seized from Shirk's vehicle at that time.  (*Id.* at 278–282; *see* Def. Ex. 9, 11.1 –11.10.)

### C. The 302 Warrant Application and the Transport of Shirk to Chambersburg Hospital

As detailed above, after receiving the initial call from Officer Bender, Chief Hopkins contacted the Lebanon County Crisis Hotline in addition to contacting law enforcement.  (Tr. at 22.)  Chief Hopkins connected the on-call worker directly with Chamberlain.  (*Id.*)  Savannah Bundy ("Bundy"), a Crisis employee, took the

information for the 302 petition from Chamberlain over the phone.  (Tr. at 52;

Gov't Ex. 2, pp. 1–6.)  Chamberlain then followed up by sending an email at 9:14

p.m. at Bundy's request in compliance with the COVID procedures in place in

Lebanon County.  (Gov't Ex. 2, p. 4.)  Employees were not permitted to leave the

office and obtain written statements in person because of pandemic-related

restrictions in this time period.  (Tr. at 53.)  After receiving this information,

Bundy contacted Brenda Startoni ("Startoni"), a Mental Health Delegate for

Lebanon County, via phone.  (*Id.* at 52.)  According to Startoni, every county

handles 302 paperwork differently.  (*Id.*)  In Lebanon County, if the Mental Health

Delegate is not physically present, the employees provide authorization via Part II

of the application—Authorization for Transportation to an Approved Facility for

Examination Without a Warrant (Under Section 302(a)(2)).  (*Id.* at 51–52; Gov't

Ex. 2, p. 5.)

Startoni testified that when 302 paperwork is initiated and approved in one

county, but the individual at issue is located in another county, the receiving

county has discretion to determine whether to honor the 302 paperwork from the

initiating county.  (*Id.* at 55–56.)  As a result, some counties enter into agreements

with bordering counties regarding how to handle their 302 paperwork.  (*Id.*)

Lebanon County did not have such an agreement with Franklin County.  (*Id.*)

When Bundy provided the information contained in the petition to Startoni, Startoni was looking for indications that Shirk was having thoughts of violence to self or others, a plan, means, intent, and acts in furtherance.  (*Id.* at 59.)  She found that all of these factors were present based on the information provided by Chamberlain to Bundy, including: Shirk verbalized his thoughts; he verbalized that he had a list of Democratic Senators' addresses; he had access to guns and was seen by Chamberlain putting an AR-15 and ammunition into his car; and he drove in the direction indicated.  (*Id.* at 59–60.)  Therefore, Startoni found that a 302 evaluation was warranted and provided authorization over the phone to Bundy at 9:17 p.m.  (*Id.*; Gov't Ex. 2, p. 5.)

Bundy notified Chief Hopkins of the verbal authorization, who then notified Sergeant Martin at PSP Chambersburg.  (Tr. at 40.)  Chief Hopkins received a faxed copy of the 302 authorization and sent it to Sgt. Martin.  (*Id.* at 31; 40.)  The record includes conflicting testimony and evidence as to the exact time of Shirk's detention in relation to the time the 302 examination was authorized.  The CAD printout shows that Shirk was detained at 9:18 p.m.  (Gov't Ex. 11, p. 3.)  Hopkins' report states that he was notified at approximately 9:19 p.m. that Shirk was detained and then received a fax from Lebanon County Crisis validating the 302 warrant.  (Def. Ex. 10, p. 2.)  Trooper Myers testified that he believed Shirk was taken into custody at around 8:30 or 8:45 p.m., but that it may have been closer to

9:00 p.m. (Tr. at 72.) Trooper Jang testified that he arrived at Sheetz at around 9:00 p.m. or 9:10 p.m. and Shirk was being detained as he arrived. (*Id.* at 81–82; 87; 93.) While the court cannot fully resolve these factual discrepancies, it is sufficient for purposes of ruling on Shirk's motion to find that Shirk was detained within 30 minutes of the 302 authorization by Startoni.

Once the PSP determined that Trooper Jang would be transporting Shirk to Chambersburg Hospital, Shirk was put in the back seat of Trooper Jang's patrol car in handcuffs and they left the Sheetz parking lot at approximately 10:00 p.m. (*Id.* at 96.) At some point while they were on the way to the hospital, Trooper Jang was re-routed, as he was instructed to take Shirk to PSP Chambersburg for an interview. (*Id.*) Shirk has not set forth an argument that any statements made during this interview should be suppressed. After the PSP interview, Trooper Jang took Shirk to Chambersburg Hospital. (*Id.*)

Trooper Jang notified hospital staff that he was bringing someone in for a 302 evaluation. (*Id.* at 91.) Trooper Jang also advised Shirk that he was being taken to the hospital for a 302 evaluation. (*Id.* at 90.) They arrived at the hospital at 10:22 p.m. (Tr. at 109; Gov't Ex. 3, p. 34.) Trooper Jang escorted Shirk into the hospital and into his hospital room, where he removed the handcuffs. (Tr. at 291.) Trooper Jang did not make any arrangements with hospital security because Shirk

was not in police custody or under arrest.  Trooper Jang left the hospital and

returned to service at approximately 10:30 p.m.  (*Id.* at 91.)

### D. Shirk's Interactions with Hospital Staff During His Stay at Chambersburg Hospital

Pursuant to Franklin County's policies, there were two issues with the 302

paperwork from Lebanon County: (1) it was faxed and they required the original

paperwork; and (2) it was only Part II (authorization for examination without a

warrant) and they required Part III (a 302 warrant).  (*Id.* at 56–58.)  After

Chambersburg Hospital received the faxed copy of Part II, hospital staff requested

the original Part III.  (*Id.*)  Lebanon County authorized Part III, and planned to

send the paperwork to Franklin County via overnight mail delivery.  (*Id.*)

When Trooper Jang brought Shirk to the Emergency Room, the sole

complaint upon arrival was a 302 evaluation.  (Gov't Ex. 3, p. 41.)  RN Nina

Chiaruttini ("Nurse Chiaruttini"), the intake RN, thought it was unusual that

Trooper Jang left and that Shirk was not under arrest.  (Tr. at 110–12.)  Nurse

Chiaruttini took Shirk to a room typically used for psychiatric patients with no

outlets or hookups for oxygen, a TV behind glass, a shortened call light, mirrored

one-way glass, and a hospital bed.  (*Id.* at 113.)  When in one of these rooms, a

patient needs to be escorted to the bathroom and always has someone conducting

direct observation ("DO") one-on-one.  (*Id.* at 113–14.)

At Chambersburg Hospital, ER staff are responsible for conducting an initial examination and ensuring that a patient is medically cleared before a psychiatric evaluation is completed.  (*Id.* at 139; 177.)   The records created by ER staff are available to crisis staff and the psychiatrist when the evaluation is conducted.  (*Id.* at 134–37.)  RN Michaela Chamberlain ("Nurse Chamberlain") conducted a psychosocial screen and suicide risk assessment shortly after Shirk arrived in the ER.  (*Tr.* at 178; Gov't Ex. 3, pp. 44–45.)  Nurse Chamberlain also gathered Shirk's belongings, including his briefcase, and spoke with Trooper Jang before he left.  (Tr. at 174.)

At Chambersburg Hospital, when individuals are brought in for a 302 evaluation, they are seen by a physician within two hours, but a specialist, such as a psychiatrist, is not always available within the two-hour time frame prescribed by the Mental Health Procedures Act.  (*Id*. at 127; 177.)  No psychiatrist was available the night Shirk was brought in by Trooper Jang for evaluation.  (*Id*. at 177.)

Shirk told Nurse Chamberlain that he was an attorney with experience in psychiatric law and that he would be gone by morning.  (*Id.* at 174–75.)  At 11:00 p.m., during Nurse Chamberlain's mental health nurse assessment, Shirk told her that he was "traveling to Alexandria, VA and 'left early' to drop off birthday presents for his granddaughter's 3rd birthday" and that "he was also planning to 'take his weapon, to his son's to show it to him.'"  (Tr. at 182; Gov't Ex. 3, p. 45.)

Nurse Chamberlain also notes that Shirk told her he had a list of "Democrats he was planning on killing" and "he had to be in Virginia by 4 a.m." because that's when "these people are waking up in the morning," and that "they need to beat DC traffic" and that his plan was "to harm them at their homes prior to leaving for work in the morning." (Tr. at 182–83; Gov't Ex. 3, p. 45.) Nurse Chamberlain described this as an ongoing conversation, and stated that she was probing deeper into the allegations in the 302 paperwork. (Tr. at 182.)

At 10:45 p.m., while RN Autumn Furry ("Nurse Furry") was completing her triage duties with Shirk, she asked him for a list of his medications. (*Id*. at 143; 145.) Shirk advised that he had a list of his medications in his briefcase and gave Nurse Furry permission to get the list. (*Id*. at 145.) While looking through Shirk's briefcase for the medication list, she found a substantial sum of money, magazines with 16 rounds, and a card that she believed listed guns, ammo, rope, tools, meds, and magazines, in addition to Shirk's medication list. (*Id.* at 146–48; Gov't Ex. 3, p. 51.)[7] Nurse Furry went through the items in Shirk's briefcase with a security officer from the hospital present. (Tr. at 147.)

At 11:51 p.m., Nurse Furry spoke to Shirk again, and asked about suicidal ideation, which Shirk denied. (Tr. at 151; Gov't Ex. 3, p. 51.) She asked Shirk

---

[7] The court notes that the words listed on the card found by Nurse Furry are not clearly written, and thus makes no specific finding as to the exact words written on the note.

about homicidal ideation, to which he replied that he "would kill his wife, but right now maybe not." (*Id.*)  At 12:18 a.m., Dr. Kipe, the attending ER physician, ordered an inpatient psychiatric consult.  (Gov't Ex. 3, p. 52.)  Such a consult is ordered for a patient at the hospital for a 302 evaluation after the patient has been medically cleared.  (Tr. at 195–96.)  All of this occurred within the first two hours of Shirk's arrival at Chambersburg Hospital.

The purpose of Nurse Furry's conversation with Shirk was to provide information to those who were providing treatment or doing an examination or assessing his mental health and physical health.  (*Id*. at 159.)  She stated that her conversation with him was for medical purposes, not crisis intervention.  (*Id*. at 166–67.)  Shirk's statements to Nurses Furry and Chamberlain were relayed to Nurse Chiaruttini, who called the FBI tip line.  (*Id.* at 117–18.)  Nurse Chiaruttini called the FBI tip line to report the information due to a collective concern among hospital staff that Shirk may be a danger to himself or others if he were to leave the hospital, which he was legally allowed to do.  (*Id.* at 133.)  She does not recall, nor is there any evidence to show, exactly what time she made this call.  (*Id.* at 119.)  However, the court finds that it was no later than 3:00 a.m. based on the events described next.

The tip line information was forwarded to Special Agent Doupe, who arrived at the hospital to interview Shirk at 4:18 a.m. on January 22, 2021.  Notes

in Shirk's chart from 4:29 a.m. indicate that the plan was to keep Shirk overnight for evaluation and to reevaluate him once the official 302 paperwork was received. (Gov't Ex. 3, pp. 71–72.)  Special Agent Doupe's interview with Shirk lasted approximately forty minutes, after which he spoke with the nurses.  (Tr. at 257.) At that time, the nurses notified Special Agent Doupe that they were still awaiting the original 302 paperwork from Lebanon County.  (*Id*. at 266–67.)  Special Agent Doupe contacted Lebanon County as he was leaving the hospital and instructed them not to FedEx the paperwork because he would come pick it up and deliver it to Chambersburg Hospital.  (*Id.*)

A second psychiatric consult was ordered at 8:46 a.m. on January 22, 2021. (Gov't Ex. 3, p. 60.)  Special Agent Doupe returned to the hospital with the original 302 paperwork from Lebanon County at around 10:00 a.m.  (Tr. at 267– 68; Gov't Ex. 3, p. 62.)   ER staff passed the paperwork directly to crisis staff. (Gov't Ex. 3, p. 62.)  The psychiatric consult order was acknowledged at 10:23 a.m. and Dr. Chakrabarti arrived to conduct the psychiatric evaluation at 10:30 a.m. (*Id.*)  According to the 302 paperwork, Shirk was evaluated at 11:00 a.m. (Gov't Ex. 2, p. 8.)  Dr. Chakrabarti concluded that "[a]t this point in time there is not enough evidence to uphold the involuntary commitment."  (Gov't Ex. 3, p. 40.) According to Shirk's medical records, the ER disposition was set to discharge at 11:11 a.m. and he was actually discharged at 12:27 p.m.  (Gov't Ex. 3, pp. 63–64.)

17

### E. Interview by Special Agent Doupe

No one told Shirk that he was free to leave the hospital at any point during his stay prior to the discharge at 12:27 p.m. on January 22, 2021. Shirk testified that he asked to leave "pretty preliminarily" upon arrival but was told he couldn't leave until a doctor (which he assumed must be a psychiatrist) saw him. (Tr. at 292–93.) His handcuffs were removed in the hospital room, his belongings were taken, and he had to change into a hospital gown. (*Id*. at 291–92.) There was always someone either in the room watching him or observing through the one-way glass. (*Id*. at 293.) Shirk was aware that there was one-way glass in the room and that he was being constantly observed. (Id.) Because the door to his room remained open, Shirk could see the security guard station, approximately fifteen feet away from his room. (*Id*.) Shirk did not feel that he was free to leave. (*Id*.)

Special Agent Doupe received information through the tip line from Nurse Chiaruttini regarding threats to Democratic Senators. (*Id*. at 249.) When Special Agent Doupe first arrived at the hospital, he spoke with Nurse Chiaruttini in person before he was escorted to Shirk's room. (*Id*. at 250–51.) Special Agent Doupe asked Shirk if he could come in and talk and Shirk waved him in. (*Id*. at 253.) His FBI credentials were displayed and he advised Shirk that he received information from the tip line that Shirk made threats relating to Democratic Senators. (*Id*. at 251; 255.)

Special Agent Doupe then proceeded to ask Shirk whether he had threatened to go to D.C. to kill Democratic Senators, where he was going that evening, whether he had any plans to harm anyone, whether he was a member of any groups that advocate for the overthrow of government, and whether he had threatened Marsha Chamberlain that evening.  (Tr. at 259, 263; Gov't Ex. 7, p. 2.)  At no point during this interview did Special Agent Doupe tell Shirk that he had no obligation to answer questions.  (*Tr*. at 285.)  Special Agent Doupe also did not advise Shirk that he was free to terminate the interview.  (*Id*.)  While Special Agent Doupe declined at the hearing to classify Shirk as a suspect, he conceded that he was investigating allegations of a crime and that Shirk was a person of interest in that crime.  (*Id*.)  During the interview, Shirk told Special Agent Doupe that he was an attorney familiar with 302 evaluations and would get out in the morning.  (*Id*. at 260; Gov't Ex. 7, p. 1.)

Hours after the interview concluded, Shirk was evaluated and cleared by Dr. Chakrabarti but was still advised that he was not yet free to leave.  (Tr. at 294.) When Shirk's discharge was complete, security officers escorted him to the front entrance, where he was arrested by the PSP and charged with terroristic threats. (*Id*. at 294–95.)

## DISCUSSION

There are three categories of evidence Shirk seeks to suppress: (1) the evidence seized from his vehicle; (2) statements and items obtained by Chambersburg Hospital personnel; and (3) his statement to Special Agent Doupe. The Government opposes Shirk's suppression motion and counters that Shirk's detention was lawful and the inventory search was therefore constitutional; Shirk's statements to ER nursing staff do not fall under the psychotherapist-patient privilege; and that *Miranda* warnings were not required before Special Agent Doupe interviewed Shirk because it was not a custodial interrogation. The court will address each argument in turn.

### A. Shirk's Challenge to the Evidence Seized from His Vehicle

In order to determine whether the searches of Shirk's vehicle by the PSP and the FBI were valid, the court must first address Shirk's argument that it was unconstitutional to detain him. (Doc. 40, pp. 12–16.) On this initial question, the Government argues that Shirk was lawfully detained. (Doc. 48-1, pp. 1–15.) The court concludes that Shirk's detention did not violate the Constitution.

With respect to the PSP's initial detention of Shirk at Sheetz, the court must consider the propriety of the police action in the context of public safety responsibilities when presented with a person who may be suffering from a mental or emotional impairment that could potentially render that individual a danger to

himself or others.  As a general matter, "an officer may, consistent with the Fourth

Amendment, conduct a brief, investigatory stop when the officer has a reasonable,

articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S.

119, 123 (2000).  In addition, in the specific factual context where there are health

and safety concerns in play, it is well settled that "the temporary involuntary

commitment of those deemed dangerous to themselves or others qualifies as a

'special need' permitting the state to act without a warrant."  *Doby v.*

*DeCrescenzo*, 171 F.3d 858, 871 (3d Cir. 1999).

   In addition, Pennsylvania law "allows peace officers who observe an

individual behaving in such a way that gives an officer 'reasonable grounds to

believe that [the individual] is severely mentally disabled and in need of immediate

treatment'" to submit that individual to a mental health evaluation by medical

personnel who are to determine whether that individual should be involuntarily

committed.  50 P.S. § 7302(a)(2).  Alternatively, if a warrant is issued pursuant to

section 7302(a)(1), peace officers are likewise authorized to transport the

individual to the facility specified in the warrant and to submit that individual to a

mental health evaluation.  *Id.* § 7302(a)(1).

   Against this legal backdrop, the court considers the specific factual

circumstances leading up to the detention of Shirk.  Before encountering Shirk at

Sheetz, the PSP troopers reviewed the BOLO issued by Chief Hopkins.  The

BOLO advised law enforcement officers that Shirk was "heavily armed with multiple guns including AR's and extensive amounts of ammo," that he made threats to kill his wife, that he said he had the addresses of Democratic Senators and would be going to Virginia, then D.C., to kill people, that he mentioned suicide by cop, and that they should approach him with extreme caution.  The information provided in the BOLO was sufficient to give law enforcement officers a significant concern that Shirk was potentially dangerous to himself or others.  Even without more, the officers were permitted to detain Shirk based on this concern in order to assess the situation.  Indeed, Trooper Myers testified that, upon encountering Shirk when he exited the Sheetz, he and the other officers detained Shirk and handcuffed him "to prevent the opportunity for him to be harmed or anyone else to be harmed."  (Tr. p. 75.)

Shortly after Shirk was detained, Trooper Myers was verbally advised that a 302 examination had been authorized by Lebanon County crisis staff.  At that point, the officers arranged for Trooper Jang to transport Shirk to Chambersburg Hospital for a 302 evaluation.  In addition to the fact that the troopers were made aware of the 302 authorization process verbally, Sgt. Hopkins explained that it is more common for law enforcement to take an individual who is potentially in need of an involuntary mental health commitment straight to crisis staff rather than obtaining authorization before transport.  (*Id*. at 22–23).   Thus, law enforcement

relied on both their awareness that the 302 authorization had been provided and their own authority as peace officers based on the information provided in the BOLO to detain Shirk for the purpose of transporting him for a mental health evaluation.

Pennsylvania law provides that police are permitted to detain an individual without a warrant for purposes of an involuntary mental health commitment. A warrantless detention for this purpose does not violate the Constitution. Based on the information provided to law enforcement in the BOLO and the verbal authorization to transport from the Lebanon County crisis staff, the court finds that the officers' conduct was reasonable under the circumstances. Indeed, what else could the officers have done under these circumstances given the description of Shirk's stated plans to harm himself and others? Accordingly, the court resolves the first aspect of this issue by holding that the detention of Shirk did not violate the Fourth Amendment.

Following the initial detention, Shirk was then transported to Chambersburg Hospital for a 302 evaluation. Shirk next argues that the transport was unconstitutional because the 302 authorization was not valid. The court need not determine the validity of the 302 authorization to determine that the PSP transport did not violate the Constitution. That is because the officers acted in reasonable

reliance on the information that there was a valid authorization to transport Shirk to the Chambersburg Hospital for a 302 evaluation.

In creating the good faith exception to the exclusionary rule, the United States Supreme Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984). Therefore, police officers executing a facially valid warrant cannot be held liable for executing it. *See Doby v. Decrescenzo*, No. 94-3991, 1996 U.S. Dist. LEXIS 13175, at *89–90 (E.D. Pa. Sept. 9, 1996) (collecting cases). Here, the officers acted in reasonable reliance on a verbal authorization for a 302 evaluation when they transported Shirk to Chambersburg Hospital. The authorization was provided by a neutral, detached party–Lebanon County's Mental Health Delegate. There is no duty on the part of the officers to investigate claims that a warrant was improper. *Baker v. McCollan*, 443 U.S. 137, 145-56 (1979). Therefore, the officers properly transported Shirk to Chambersburg Hospital in reasonable reliance on the information about a 302 authorization, even if the 302 authorization is later found to be invalid.

Having determined that the warrantless detention and transport of Shirk to Chambersburg Hospital for the purpose of a 302 evaluation were reasonable steps taken by law enforcement without violating the Fourth Amendment, the court turns

next to Shirk's argument that items were seized from his vehicle in violation of the Fourth Amendment and thus should be suppressed. The Government argues that the items were seized pursuant to a valid inventory search.[8] The analysis of this issue is straightforward.

Once Shirk was detained and transported to Chambersburg Hospital, his vehicle became the responsibility of the PSP. Accordingly, the PSP arranged for the vehicle to be towed to a PSP facility, where a trooper conducted a warrantless inventory search of Shirk's vehicle. The question is whether this warrantless inventory search violated the Fourth Amendment.

Shirk asserted at the hearing that the PSP could have towed the vehicle to some location other than a PSP impound, moved it away from the gas pump to a parking spot at Sheetz, or allowed Shirk to make other arrangements to move the vehicle. The Government responds by asserting that the vehicle was the responsibility of the PSP once Shirk was detained, and they had an obligation to secure Shirk's belongings because he had been taken into custody and transported to the hospital. Thereafter, an inventory search was conducted in accordance with the PSP field regulations.

---

[8] The Government also invoked the plain view doctrine in its brief in opposition to the suppression motion. However, the record did not shed light on what items may have been in plain view in Shirk's vehicle at the time officers encountered him at the Sheetz gas station. Furthermore, the Government seemingly abandoned this argument at the hearing. Therefore, no further discussion of the plain view doctrine is necessary.

There is a well-established exception to the warrant requirement that applies when police are conducting an inventory search. *See South Dakota v. Opperman*, 428 U.S. 364, 372 (1976). Automobiles are frequently taken into custody in the interest of public safety and what the Supreme Court has called "community caretaking functions." *Opperman*, 428 U.S. at 368 (quoting *Cady v. Dombroski*, 413 U.S. 433, 441 (1973)). Police departments generally have a routine practice of securing and inventorying the contents of impounded vehicles. *Id.* at 369. "These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* (internal citations omitted). All three of these governmental interests are present in this case and were served by the inventory search of Shirk's car. Moreover, even if it would have been possible to allow Shirk to make alternative arrangements for the vehicle, that is not sufficient to invalidate an inventory search conducted in good faith. *Colorado v. Bertine*, 479 U.S. 367, 373 (1987).

Shirk elicited testimony at the hearing about whether the vehicle was locked and the level of security on the impound lot. Shirk seems to suggest that his belongings were already secure in the vehicle, eliminating the need for an inventory search. However, the security of a storage facility or impound lot "does

not completely eliminate the need for inventorying; the police may still wish to protect themselves or the owners of the lot against false claims of theft or dangerous instrumentalities." *Colorado*, 479 U.S. at 373. That concern applied here because Shirk had firearms and ammunition inside the vehicle.

Shirk also argued that because all items of value were not secured from the vehicle when the PSP conducted the inventory search, the inventory search did not comply with the PSP field regulations. It is true that the trooper who completed the inventory search did not remove every item of value from the vehicle. As one example, the trooper failed to remove and inventory Shirk's cell phone. Shirk appears to be correct that the trooper's inventory did not comply with the PSP field regulation for conducting a thorough inventory of items of value in the vehicle. However, the trooper's inventory did result in the removal of firearms and ammunition from the vehicle. The inventory of these potentially dangerous items– although not as complete an inventory as the PSP field regulations would seem to require–served the valid interest of protecting the police from the potential danger of theft/use of the firearms while the vehicle remained at the PSP impound. *See Opperman*, 428 U.S. at 369. It is not obvious to the court that suppression is the appropriate remedy to address a trooper's failure to complete an inventory search with the degree of thoroughness required by the PSP field regulation. And, Shirk

has not cited any authority for the proposition that items seized during an inventory search that fails to meet the standards set by the PSP should be suppressed.

In sum, the court concludes that the conduct of the PSP in conducting an inventory search of Shirk's vehicle was not unreasonable under the Fourth Amendment and the items seized by the PSP during the inventory search will not be suppressed.

The final matter to be addressed in this portion of the discussion is Shirk's argument that the items seized from his vehicle by the FBI in March 2021, after they obtained a warrant to search the vehicle, must be suppressed as fruit of the poisonous tree. This is the sole argument for exclusion of this evidence. Because the court has found that there was no constitutional violation in detaining and transporting Shirk, towing his vehicle, and conducting an inventory search, it logically follows that the evidence seized by the FBI was not fruit of the poisonous tree and will not be suppressed.

### B. Shirk's Challenge to Statements and Physical Evidence Obtained by Chambersburg Hospital Personnel

Shirk asserts that the statements made to Chambersburg Hospital personnel are subject to the psychotherapist-patient privilege and should be excluded from evidence. (Doc. 30, pp. 19–30.) Additionally, he argues that the authorization or warrant for a 302 examination was invalid, and as a result, the statements he made at the hospital, as well as the list recovered from his briefcase, should be

28

suppressed as fruit of the poisonous tree.  (*Id*., pp. 17–19.)  The court will evaluate these arguments separately.

### i.  Psychotherapist-Patient Privilege

In arguing for the exclusion of his statements to Nurses Chamberlain and Furry while at Chambersburg Hospital, Shirk acknowledges that he is asking the court to expand the scope of the psychotherapist-patient privilege to nurses and agents of the psychiatrist/therapist.  The Third Circuit has not yet addressed this issue.  In response, the Government argues that the privilege does not currently apply to nurses, and that even if we were to extend the privilege, the statements to Nurses Chamberlain and Furry were not made "in the course of diagnosis or treatment" and would therefore fall outside the scope of the established privilege for that reason.  As explained below, the court finds that the statements at issue were not made in the course of diagnosis or treatment and therefore fall outside the scope of the psychotherapist-patient privilege.

When examining evidentiary privileges, the court starts with the fundamental maxim that the public has a right to every man's evidence and "[w]hen we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." *United*

*States v. Bryan*, 339 U.S. 323, 331 (1950).  The Federal Rules of Evidence

authorized federal courts to define new evidentiary privileges by "interpreting

common law principles . . . in the light of reason and experience."  *Jaffee v.*

*Redmond*, 518 U.S. 1, 8 (1996).  Thus, the general rule favoring the admission of

evidence permits for exceptions for certain privileged communications.

In *Jaffee*, the Supreme Court addressed the question of "whether a privilege

protecting confidential communications between a psychotherapist and her patient

promotes sufficiently important interests to outweigh the need for probative

evidence."  *Jaffee*, 518 U.S. at 9–10 (internal quotations omitted).  In establishing a

federal psychotherapist-patient privilege, the Court was persuaded by both "reason

and experience."  *Id.* at 10.

> Like the spousal and attorney-client privileges, the psychotherapist-patient privilege is "rooted in the imperative need for confidence and trust."  Treatment by a physician for physical ailments can often proceed successfully on the basis of a physical examination, objective information supplied by the patient, and the results of diagnostic tests. Effective psychotherapy, by contrast, depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears.  Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace.  For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

*Id.*  Furthermore, the Court recognized that a psychiatrist's ability to help her

patients is entirely dependent on the patient's willingness and ability to talk freely

and that a psychiatrist could not effectively do her job without being able to assure her patients that their communications were confidential.  *Id.*  Thus, the Supreme Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence."  *Id.* at 15.

In *Jaffee*, the Court also held that the psychotherapist-patient privilege extended to statements made to licensed social workers in the course of psychotherapy.  *Id.* at 17.  In doing so, the Court considered the fact that social workers provide a significant amount of mental health treatment and that their counseling sessions, often provided to the poor, serve the same public goals as counseling sessions from licensed psychotherapists.  *Id.* at 16.  Therefore, the Court found no reason to draw a distinction between the counseling provided by psychotherapists and the more readily accessible counseling provided by social workers because it would serve no discernible public purpose.  *Id.* at 17.

Turning to this case, the court must first determine whether, as a general proposition, the psychotherapist-patient privilege should apply to statements made during a 302 evaluation considering the unique function of this kind of evaluation. The court finds the privilege is generally applicable in this context.  According to the Pennsylvania statute authorizing involuntary mental health evaluations, the purpose of detaining an individual for a 302 examination is for a physician "to

31

determine if the person is severely mentally disabled . . . and in need of immediate treatment." 50 P.S. § 7302(b). Furthermore, the statute requires the physician to "make a record of the examination and his findings." *Id.* While the statute does not use the word "diagnosis," it is clear that the examination contemplated by the statute is for the purpose of making a mental health diagnosis. Therefore, the purpose of a 302 evaluation is to make a diagnosis to determine whether an individual needs to be involuntarily committed to receive treatment. This purpose is consistent with the purpose protected by the psychotherapist-patient privilege.

Having determined that the psychotherapist-patient privilege is generally applicable in the context of a 302 evaluation, the court now turns to whether the statements at issue here were made "in the course of diagnosis or treatment." It appears that the Third Circuit Court of Appeals has not yet had the opportunity to discuss what it means for a statement to be made "in the course of diagnosis or treatment." Other circuit courts, however, have narrowly interpreted the "in the course of diagnosis or treatment" language from *Jaffee*. *See, e.g.*, *United States v. Wynn*, 827 F.3d 778 (8th Cir. 2016) (holding that statements made to nurses taking hotline calls were not statements made during the course of diagnosis or treatment and the privilege did not apply); *United States v. Ghane*, 673 F.3d 771 (8th Cir. 2012) (holding that the privilege only applies to those licensed individuals "actually involved in mental health treatment," which did not include the physician

assistant who conducted an intake assessment at the ER); *United States v. Romo*, 413 F.3d 1044 (9th Cir. 2005) (holding that where a prisoner called a meeting with the prison psychiatrist with whom he had previously sought treatment and made incriminating statements, these statements were not made for the purpose of diagnosis or treatment and were not privileged); *United States v. Schwensow*, 151 F.3d 650, 657 (7th Cir. 1998) (holding that statements made to volunteers for an Alcoholics Anonymous Hotline were not privileged because the appellant approached the office to find an address for a detoxication center, not to get help with his alcoholism).

Given the factual similarities to this case, as well as the consistency with Pennsylvania case law relating to the psychotherapist-patient privilege, the court will rely on the analysis set forth in *United States v. Ghane*.  In *Ghane*, the defendant was suicidal and called a crisis hotline.  673 F.3d at 775.  Hotline personnel contacted the local police department, who dispatched officers to Ghane's address.  *Id.*  Ghane told officers that he wanted help and asked to speak with a doctor.  *Id.*  At his request, the officers transported him to a local medical center.  *Id.*  Once there, Ghane checked himself into the emergency room, where Gluhovsky, a physician assistant, conducted a routine examination for intake purposes.  *Id.*  According to the protocol at the medical center, a patient who presents himself to the ER must first be evaluated in the ER prior to ultimate

placement in the appropriate unit.  *Id.*  Gluhovsky used a specific intake form when conducting the intake interview with Ghane because he presented with depression and suicidal ideation.  *Id.*

During the intake evaluation, Ghane advised that he was having suicidal thoughts.  *Id.*  Gluhovsky probed further, asking if Ghane had a "plan and means" to commit suicide, to which Ghane responded that if he were to do so, he would use cyanide, which he had access to at his apartment.  *Id.*  Ghane further stated that he was not willing to give up the cyanide because "he might want to use it later." *Id.*  Following the interview, Gluhovsky obtained permission from the hospital to contact the police, due to the potential for public harm.  *Id.*  Subsequently, a detective arrived at the hospital to interview Ghane and obtain written permission to search his apartment.  When police searched Ghane's apartment, potassium cyanide was located and seized.  *Id.* at 775–76.

Once Ghane was admitted to the psychiatric ward, he was treated by Dr. Houghton, a clinical psychiatrist who had treated Ghane periodically for many years.  *Id.* at 776.  When Dr. Houghton first saw Ghane that day, he conducted a routine clinical examination for admission purposes.  *Id.*  Ghane discussed suicidal thoughts and thoughts of harming specific individuals during this evaluation.  *Id.* Dr. Houghton noted that Ghane seemed "markedly different" and that he was unusually paranoid.  *Id.*  Therefore, Dr. Houghton sought guidance from the

34

hospital about whether and how to report this information to law enforcement.  *Id.*
After obtaining oral and written consent from Ghane to provide the information to
law enforcement, Dr. Houghton talked to an FBI agent.  *Id.*  Ghane was
subsequently charged criminally and convicted.  *Id.*

On appeal from his conviction, Ghane argued, *inter alia*, that the trial court
erred by allowing Gluhovsky's testimony at trial.  *Id.* at 779.  Ghane argued that
the statements to Gluhovksy were covered by the psychotherapist-patient privilege.
*Id.*  In determining whether the privilege applied with respect to Ghane's
statements to a physician assistant, the court first looked to the logic and reason
supporting the privilege as set forth in *Jaffee*.  *Id.* at 780–81.  The court then
considered Ghane's argument, based on the 1972 rules proposed by the Judicial
Conference Advisory Committee, recommending that Congress recognize a
psychotherapist-patient privilege as part of the Federal Rules of Evidence, in which
the privilege was recommended to apply to communications made to "those
present to further the interest of the patient in the consultation, examination or
interview."  *Id.* at 782.  (quoting 56 F.R.D. 183, 240–44 (1972)) ("Supreme Court
Standard 504").  The court acknowledged that the Supreme Court Standard 504
was a "useful starting place" for examining the privilege, despite Congress failing
to enact such a detailed article on privileges.  *Id.*

However, after considering these authorities, the *Ghane* court held that the psychotherapist-patient privilege "does not encompass 'care' provided by an ER physician's assistant whose job is to assess incoming patients and conduct intake interviews and evaluations." *Id.* The court noted that in *Jaffee*, "the Court only contemplated information gleaned during actual psychotherapy sessions conducted, obviously, by a licensed therapist" and that the "Court even made a point to extend the privilege to licensed social workers as well as licensed psychiatrists, all of whom provide actual mental health treatment." *Id.* Gluhovsky, however, was not providing mental health treatment to Ghane. He was simply completing intake forms as part of the hospital's protocol for incoming patients for the purpose of determining placement for treatment. *Id.* at 783. Therefore, the court held that the communications between Ghane and Gluhovsky were not subject to the privilege under *Jaffee*. *Id.* The Supreme Court Standard 504(b) also discusses the patient's purpose in communicating with his psychotherapist. The court held that Ghane spoke to Gluhovsky for purposes of hospital admission, not treatment, and that Gluhovsky "did not provide any therapy, diagnosis, or treatment to Ghane during their brief encounter." *Id.*

The court further held that Gluhovsky was not integral or necessary to Ghane's psychiatric treatment in that he merely "facilitated Ghane's placement as a psychiatric patient." *Id.* Specifically, the court noted that Gluhovsky did not work

36

for the psychiatric unit, but reported to his supervisor, the attending ER physician. *Id.* The court also rejected Ghane's argument that the statements were privileged because the information collected by Guhovsky was made available in Ghane's chart to the psychiatrist, Dr. Houghton. *Id.* Although the information became part of Ghane's admitting chart, "there is no evidence that this information was used in Ghane's later treatment or diagnosis" and there was no evidence that "Dr. Houghton had . . . contact with Gluhovsky throughout these incidents." *Id.* at 783–84. Furthermore, the court held that "Gluhovsky in no way treated Ghane, did not conduct psychotherapy or counseling, nor did he consult with Dr. Houghton or any other psychiatrist during the relevant time period." *Id*. at 784. The *Ghane* court conclude that "passing intake information along in a chart does not suffice as 'treatment' sufficient to cloak these conversations with privilege." *Id*.

The court's decision to rely on the Eighth Circuit's decision in *Ghane* is consistent with Pennsylvania's application of the psychotherapist-patient privilege. In Pennsylvania, the psychotherapist-patient privilege exists by way of statute. 42 Pennsylvania Consolidated Statute § 5944 provides:

> No psychiatrist or person who has been licensed . . . to practice psychology shall be, without the written consent of his client, examined in a civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

Pennsylvania courts have held that the purpose of the privilege is to prevent the treating psychologist or psychiatrist from testifying against the client. *Commonwealth v. Pukowski*, 147 A.3d 1229, 1235–36 (Pa. Super. Ct. 2016). Further, "[w]hile documents prepared during the course of treatment may sometimes fall within the privilege, *Section 5944 pertains only to confidential communications between psychiatrists or psychologists and their patients/clients that were made in the course of treatment, not to all records and documents regarding mental health treatment*." *Id.* (emphasis added).  In order to determine when to apply the privilege, Pennsylvania "courts must look to the purpose and circumstances under which the declarant made them." *Id.*

Pennsylvania courts have held that the privilege extended to "members of the [psychotherapist's] treatment team." *Commonwealth v. Simmons*, 719 A.2d 336, 343 (Pa. Super. Ct. 1998).  However, the court in *Commonwealth v. Simmons* also noted that for a statement to be privileged, it must be made by the patient "in confidence" to a member of the treatment team and "in the course of facilitating the treatment plan." *Id.*  Where a patient was committed on a 302 warrant and made statements to a fellow patient that were overheard by a security counselor, the court held that the statements were not privileged because they were not confidential, *they were not made in the course of treatment*, and were not made to a

member of the individual's treatment team.  *Commonwealth v. Cook*, 231 A.3d 913, 922 (Pa. Super. Ct. 2020).

As noted above, the facts of this case are remarkably similar to the critical facts in *Ghane*.  As in *Ghane*, Nurses Furry and Chamberlain did not work in the psychiatric unit in the hospital, but answered to the attending ER Physician, Dr. Kipe.  As in *Ghane*, the statements Shirk made to these nurses were recorded and became part of Shirk's hospital chart.  Just as Dr. Houghton did not have any contact with Gluhovsky in *Ghane*, in this case there is no indication that Dr. Chakrabarti had any contact with Nurses Furry and Chamberlain.  In fact, both nurses testified that they finished their shifts at 7:00 a.m., several hours before Dr. Chakrabarti evaluated Shirk.

Additionally, as in *Ghane*, Nurses Furry and Chamberlain did not provide mental health treatment to Shirk, they did not conduct psychotherapy or counseling, or consult with a psychiatrist during the relevant time period.  Their purpose was to conduct his intake paperwork and to ensure that he was medically stable before the psychiatric evaluation was ordered.  In *Ghane*, the court held that passing intake information along in a chart does not suffice as treatment sufficient to cloak the conversations in privilege.  That is exactly what role Nurses Furry and Chamberlain played during Shirk's stay at Chambersburg Hospital.  The psychotherapist-patient privilege, as set forth in *Jaffee*, limits the application of the

privilege to individuals "actually involved in mental health treatment."  Nurses Furry and Chamberlain were not involved in Shirk's mental health treatment.

It is clear that the purpose of a 302 evaluation is to determine whether an individual is in need of an involuntary commitment to receive mental health treatment.  It is also clear that a 302 evaluation requires a diagnosis, or a physician's "findings," which are to be documented.  It is not clear, however, from the record before the court, that Nurses Furry and Chamberlain, who were ER nurses responsible for medically clearing and stabilizing Shirk so he could be evaluated by a psychiatrist, had any role in Shirk's mental health diagnosis.  Critically, the statements that Shirk made to Nurses Chamberlain and Furry were made during the initial period of Shirk's stay in the hospital, during which Shirk was being medically cleared so that a psychiatric evaluation could be ordered and he could be diagnosed.[9]

Because the court finds that the statements at issue were not made in the course of mental health diagnosis or treatment, the court concludes that the statements are not privileged.  In arriving at this conclusion, the court has not determined whether the privilege should be extended to nurses because it is not

---

[9] Shirk's statement to Nurse Chamberlain was at 11 p.m. and Shirk's statement to Nurse Furry was at 11:51 p.m.  Dr. Kipe did not initially order the inpatient psych consult until 12:18 a.m. Per Nurse Furry's testimony, the psychiatry consult is ordered once the patient is medically cleared for a psychiatric evaluation.

necessary to make that determination in this case.  Stated simply: the court holds

the psychotherapist-patient privilege does not require exclusion of Shirk's

statements to Nurses Furry and Chamberlain because of the context in which the

statements were made, not because the statements were made to nurses instead of a

psychotherapist or a licensed social worker.

      The court notes that the Government has only identified the statements to

Nurses Furry and Chamberlain as statements it intends to introduce at trial in its

brief in opposition to Shirk's motion.  However, Government's counsel indicated

at the suppression hearing that the Government does not concede that the

remainder of Shirk's statements are privileged.  The court finds that any statements

Shirk made to Dr. Chakrabarti during the evaluation would fall squarely within the

psychotherapist-patient privilege set forth in *Jaffee*.  Furthermore, any statements

Shirk made to crisis workers would also be covered by the privilege as it relates to

licensed social workers as set forth in *Jaffee*.  As to any other statements or

information within the records, to the extent that the Government may seek to

introduce this evidence at trial, the court will make rulings consistent with this

opinion and the Federal Rules of Evidence at the time the evidence is introduced at

trial or addressed by motion in limine.

      The court also notes the strength of the argument raised by Shirk's counsel

with respect to the subjective perspective of the individual being involuntarily

evaluated in a hospital.  Shirk's counsel argued that it would be unreasonable to expect a person in that situation to distinguish between the psychiatry staff and the emergency room staff or to understand the different purposes served by the staff members who were evaluating him.  From a common-sense perspective, the court agrees with this observation.  The court accepts that Shirk likely did not understand the different roles of the various hospital staff members with whom he interacted throughout the course of his stay.

Having considered this argument, however, the court concludes that a patient's subjective lack of understanding of the different medical roles of hospital staff cannot be the determining factor with respect to the application of the privilege.  That is because the purpose behind the privilege would be defeated if the patient's subjective understanding were the determining factor in analyzing whether the privilege should apply.  An example proves the point:  A member of the hospital maintenance staff enters a psychiatric patient's room to fix a leaky faucet and, without identifying himself as maintenance staff, asks the patient how he is doing today.  The patient responds to the friendly question by stating that he killed his neighbor and buried the body in the woods before he came to the hospital.  At a pretrial hearing, the patient (now defendant) claims that he believed that the person to whom he made the statement was a psychiatrist who came into his room to diagnose and treat his mental health conditions.  Should the statement

42

be deemed privileged because of the patient's subjective belief?  The court finds

that it should not.  This example demonstrates the difficulty inherent in

determining the application of the privilege based on the patient's subjective

understanding of the role of the person to whom a statement is made.  The purpose

for the privilege is preserved by instead making the determination based on

objective evidence demonstrating the actual–not perceived–context and purpose

for the statement.

### ii.  Fruit of the Poisonous Tree

Shirk also argues that he was illegally held at Chambersburg Hospital for

approximately fourteen hours before being discharged.  (Doc. 40, p. 14.)  He

argues that this prolonged detention was illegal, and that any evidence obtained as

a result of his stay—such as the list found in his briefcase and the aforementioned

statements to Nurses Furry and Chamberlain—is fruit of the poisonous tree and

must therefore be suppressed.  (*Id.*, pp. 13–15).  The court disagrees.

Evidence obtained as a result of a Fourth Amendment violation ordinarily

must be suppressed as "fruit of the poisonous tree."  *Wong Sun v. United States*,

371 U.S. 471, 487–88 (1963).  The question here is whether there has been a

Fourth Amendment violation.  As determined in the first section of this discussion,

the law enforcement officers did not violate the Fourth Amendment by detaining

Shirk or transporting him to Chambersburg Hospital for a 302 evaluation.  When

Trooper Jang delivered Shirk to the hospital, Shirk was not under arrest and he was no longer in police custody.  In fact, at that point, there was no open investigation by law enforcement and there were no pending criminal charges against Shirk. After Trooper Jang delivered Shirk to the intake nurse at the hospital, he left the hospital and had no further involvement.

There was no law enforcement request or requirement for Shirk to be held in the hospital.  Rather, the hospital staff made the determination to hold and evaluate Shirk while awaiting the original 302 warrant from Lebanon County authorities. Shirk's prolonged detention at Chambersburg Hospital was the result of decision-making by hospital staff, not by law enforcement.  There is no evidence in the record that Chambersburg Hospital itself or hospital staff are government actors. "Suppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity."  *See Segura v. United States*, 468 U.S. 796, 815 (1984) (internal quotations omitted).  Thus, even assuming that the fourteen-hour hold was unlawful, the fruit of the poisonous tree doctrine has no application absent any unlawful action by law enforcement or a government actor.

### C. Shirk's Challenge to His Statement to Special Agent Doupe

Lastly, Shirk argues that the interview with Special Agent Doupe constituted a custodial interrogation, and the statements he made during the interview should

be suppressed because he was not advised of his *Miranda* rights.  (Doc. 40, pp. 31–33.)  The court agrees.

Pre-interrogation warnings are required during custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 458 (1966).  In *Miranda*, the Court defined "custodial interrogation" as meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.* at 444.  Subsequently, the Court had several opportunities to apply the custody test.  First, where a suspect voluntarily went to the police station and had been informed that he was not under arrest and that he was free to leave at any time, the Court held that there was no custodial interrogation because there was "no indication that the questioning took place in a context where [the suspect's] freedom to depart was restricted in any way." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  On a similar set of facts involving a parolee who was emotionally distraught, the Court came to the same conclusion, that there was no custodial interrogation, while noting that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1124-25 (1983).

In a more recent case, the Court instructed that the custody determination must focus on "how a reasonable man in the suspect's position would have

understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, n. 35 (1984).

This framework was further confirmed by the Court when it held that "the initial

determination of custody depends on the objective circumstances of the

interrogation, not on the subjective views harbored by either the interrogating

officers or the persons being questioned." *Stansbury v. California*, 511 U.S. 318,

323 (1994).  The Court held that when conducting an inquiry into custodial

interrogation, courts must examine "all of the circumstances surrounding the

interrogation" to determine "how a reasonable person in the position of the

individual being questioned would gauge the breadth of his or her freedom of

action." *Id.* at 322, 325.  Furthermore, "[a]n officer's knowledge or beliefs [about

a suspect's guilt] may bear upon the custody issue if they are conveyed, by word or

deed, to the individual being questioned." *Id.* at 325.  In such cases, the relevant

question is whether the officer's manifestation of suspicion "would have affected

how a reasonable person in that position would perceive his or her freedom to

leave." *Id.*  Finally, the Court offered the following description of a custodial

interrogation test for *Miranda* purposes:

> Two discrete inquiries are essential to the determination: first, what
> were the circumstances surrounding the interrogation; and second,
> given those circumstances, would a reasonable person have felt he or
> she was not at liberty to terminate the interrogation and leave.  Once
> the scene is set and the players' lines and actions are reconstructed, the
> court must apply an objective test to resolve the ultimate inquiry: was
> there a formal arrest or restraint on freedom of movement of the degree
> associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995).   In answering these questions, courts frequently look to the following non-exhaustive list of factors:

> (1) whether the officers told the suspect that he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006).

Here, it is undisputed that Shirk was not under arrest at the time of the interrogation.  But it is also undisputed that no one, from the time of his arrival at the hospital in handcuffs until his discharge approximately fourteen hours later, advised Shirk that he was free to leave the hospital.  Specifically, Special Agent Doupe did not advise Shirk that he was free to leave or to terminate the interview.  On balance, the court finds that this factor weighs in favor of finding the setting to be custodial.[10]

---

[10] While this finding may seem to be contrary to the court's holding that the fruit of the poisonous tree doctrine is inapplicable, the analysis differs markedly.  When analyzing whether the fruit of the poisonous tree doctrine applies, the court must first determine whether there was any law enforcement conduct.  When analyzing whether there was a custodial interrogation, the court must look at the totality of the circumstances and determine whether a reasonable person in the same circumstances would believe he was free to leave.  This includes considering all existing circumstances, whether or not law enforcement was involved in creating those conditions.  Therefore, it is not contradictory for there to be a custodial interrogation in a hospital setting where a lengthy detention occurred due to the actions of non-law enforcement actors.

The next factor, the location and physical surroundings of the interrogation, also weighs in favor of finding the setting to be custodial. While hospitals are generally a less coercive environment than a police station, the court finds that a reasonable person in Shirk's circumstances would not feel free to leave. Shirk was in a hospital gown and all of his belongings, including his briefcase and wallet, were removed from him. He had been taken to the hospital room in handcuffs by a law enforcement officer and it was not an ordinary hospital room. Shirk was under constant observation by the DO and could see the security station from his room. He was not even permitted to use the restroom alone as he was required to have someone from the hospital escort him. Shirk was told when he arrived that he was not permitted to leave until he was evaluated, presumably by a psychiatrist. That evaluation had not yet occurred when Shirk was interviewed.

The remaining three factors weigh against a finding that the setting was custodial. The interrogation was less than an hour, which is not unduly prolonged resulting in a coercive situation. There is no indication that Special Agent Doupe used any overtly coercive tactics such as a hostile tone of voice or physical restraint during his interview with Shirk. The agent was wearing plain clothes, but also noted that he likely had his badge displayed and probably his weapon. In addition, the testimony suggests that Shirk appeared to voluntarily submit to questioning.

While a review of these factors tilts the scale slightly on the side of finding the setting to be non-custodial, the court also concludes that Shirk was clearly a suspect at the time Special Agent Doupe conducted the interview.  Special Agent Doupe received information from the FBI tip line that Shirk was making threats to the lives of Democratic Senators, which, as demonstrated by the Indictment in this case, is a federal criminal offense.  As a result, Special Agent Doupe went to the hospital to interview Shirk, who was the person who allegedly made those threatening statements.  At the hearing, Special Agent Doupe testified that there was an ongoing criminal investigation and Shirk was a person of interest in that investigation.  Special Agent Doupe began the interview with Shirk by advising him that he received information that Shirk made threats to Democratic Senators.  This was clearly a "manifestation of suspicion," as contemplated in *Stansbury*, that would affect how a reasonable person in Shirk's position would perceive his or her freedom to leave.  Special Agent Doupe then proceeded to ask Shirk numerous questions about whether he had made threats to Democratic Senators, where he was going that evening, whether he was involved in any anti-government groups, and more.  This finding, which the court accords significant weight, tilts the scale firmly onto the side of finding the setting to be custodial.

Accordingly, the court concludes that under the totality of the circumstances present here, a reasonable person in Shirk's position would not feel free to

terminate the interview or to leave the room.  Therefore, Shirk was subjected to custodial interrogation and should have been provided his *Miranda* rights.  Both parties agree that this was not done.  As a result, Shirk's statements to Special Agent Doupe will be suppressed.

## CONCLUSION

For the reasons stated herein, the court will grant Shirk's motion to suppress as to the statements made to Special Agent Doupe; deny Shirk's motion to suppress the evidence seized from his vehicle; and deny Shirk's motion to suppress the statements made to Nurses Chamberlain and Furry and the list found in his briefcase.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: January 10, 2022