

**ABOM &**
**KUTULAKIS**

*John A. Abom, Esquire*
*Attorney I.D. No.: 77961*
*2 West High Street*
*Carlisle, Pennsylvania 17013*
*(717) 249-0900*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 1:21-CR-00017 |
| | : | |
| v. | : | |
| | : | (Judge Wilson) |
| KENELM SHIRK, III, | : | |
| Defendant | : | |

## DEFENDANT'S
## PRE-SENTENCING MEMORANDUM

**AND NOW**, comes the Defendant, Kenelm Shirk III, by and through his

counsel, John A. Abom, Esquire, and submits the following Pre-Sentencing

Memorandum, respectfully requesting the Honorable Court consider the information

submitted herein and impose a sentence of time served.

### I.    Statement of the Case

On January 27, 2021, a one-count Criminal Complaint was filed charging Kenelm

Shirk III with threatening to murder a United States official, on or about January 21,

2021, in violation of 18 U.S.C. § 115(a)(1)(B). (Pre-Sentence Investigation Report,

hereinafter referred to as "PSR," at ¶ 1). On February 3, 2021, a one-count Indictment

was returned charging Mr. Shirk with threatening to murder a United States official, on

or about January 21and 22, 2021. (*Id.* at ¶ 2).

1

On March 7, 2022, Mr. Shirk pled guilty to the Indictment pursuant to a written plea agreement whereby the Government agreed to recommend a two- or three-level reduction for acceptance of responsibility if warranted and to bring no further charges against Mr. Shirk directly arising from his involvement in the instant offense. (*Id.* at ¶ 3). Further, Mr. Shirk agreed to waive the right to challenge venue and his right to appeal any conviction and sentence on any grounds, as well as to forfeit three (3) firearms listed in the plea agreement. (*Id.*).

In relevant part, the offense conduct consists of Mr. Shirk's ex-wife, Marsha Chamberlain, with whom he was living at the time, calling the Cornwall Township Police Department in Lebanon, Pennsylvania, on January 21, 2021, and reporting that Mr. Shirk said he was driving to Virginia to drop off birthday presents for his granddaughter and then threatened to kill democratic United States senators. (*Id.* at ¶ 5). Ms. Chamberlain saw Mr. Shirk place an AR rifle and a box of ammunition into his SUV and drive away. (*Id.*). Ms. Chamberlain petitioned for a 302 mental health warrant through the Lebanon County Crisis Center, which was granted, prompting the police to issue a "be on the lookout" ("BOLO") for Mr. Shirk and his vehicle. (*Id.* at ¶ 7).

Later that evening, Pennsylvania State Police, Chambersburg Barracks, notified Cornwall Township Police Department that Mr. Shirk had been taken into custody without incident on the 302 warrant at a local Sheetz gas station and was being transported to Chambersburg hospital for an evaluation. (*Id.* at ¶ 8). A search of Mr.

Shirk's vehicle yielded two (2) handguns and an AR rifle, as well as ammunition and magazines. (*Id.*).

On January 22, 2021, at approximately 2:00 a.m., a nurse at Chambersburg Hospital contacted the FBI tip line to report various statements Mr. Shirk had made while hospitalized on the 302 warrant, due to a concern among hospital staff that Shirk may be a danger to himself or others if he were to leave the hospital, which he was legally permitted to do at the time. (*Id.* at ¶¶ 9-10). An FBI agent responded to the information provided to the tip line by going to the hospital to interview Mr. Shirk at 4:18 am. (*Id.* at ¶ 10).

After two (2) psychiatric consults that occurred several hours later, it was determined that there was not enough evidence to uphold an involuntary commitment and Mr. Shirk was discharged from the hospital, at which point he was arrested by the Pennsylvania State Police and charged with terroristic threats. (*Id.*).

II.   **Outstanding Objections to the PSR**

   a. **Paragraph 17 of the PSR is objected to insomuch as it applies a 2-level increase based on the fact that Mr. Shirk made more than two (2) threats during the course of the instant offense.**

When Marsha Chamberlain made her initial report to Lebanon County dispatch and the first responding officer, she never mentioned that Mr. Shirk threatened to kill her. In fact, Ms. Chamberlain never mentioned that Mr. Shirk threatened to kill her at any point.

Further, when Mr. Shirk was involuntary admitted at the Chambersburg Hospital, he was repeatedly asked whether he had suicidal thoughts and repeatedly denied that he was. The comment made during the course of the medical interview was a sarcastic comment made in the context of the situation in which he found himself. At Mr. Shirk's suppression hearing, the testimony was that Mr. Shirk made his sarcastic comment about killing his wife during an interview with a nurse, Michaela Chamberlain. Ms. Chamberlain first asked if Mr. Shirk had any suicidal thoughts, which he denied having. When asked if he had homicidal thoughts, he first said no but then he sarcastically stated that he would kill his wife but "right now maybe not." This statement was made in the context of what he was thinking, not what he was planning on doing. Further, Mr. Shirk's statement was made while he was detained in the hospital and not a statement of his intended future actions. This statement was not a threat.

Common sense would suggest that many individuals sometimes make reference to killing another person or being killed by another person when that other person would find out what they were doing. A husband saying his wife would kill him when he came home late or that he would kill his wife because of something she did or said should not be construed as an actual threat of intent to kill and, rather, his statement as in those cases, was in this case, hyperbole.

Further, pursuant to U.S.S.G. § 2A6.1 Application Note 1 (Scope of Conduct to be Considered), the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense.

4

In this case, if the Court were to consider Mr. Shirk's statement about homicidal ideations as a threat, that threat occurred *after* Mr. Shirk made the threats about public officials to Marsha Chamberlain, and then he repeated the threat to Nurse Michaela Chamberlain at 11:00 p.m. (*See* Exhibit #1, Chambersburg Hospital Records Excerpt). Almost an hour later, at 11:51 pm., during an interview with Nurse Autumn Furry, Mr. Shirk answered the question about homicidal ideations, stating, "Yea I would kill my wife but right now maybe not." Since this "threat" was made after the offense, it should not be considered relevant conduct as it did not relate to the offense of conviction.

   b. **Paragraphs 6 and 41 of the PSR are objected to insomuch as Mr. Shirk is alleged to have intended to commit "suicide by cop."**

   Mr. Shirk never used the words "suicide by cop" and specifically never said that he intended to commit suicide by cop. Mr. Shirk asks that this language in the PSR be stricken from Mr. Shirk's final Pre-Sentence Report.

   When Mr. Shirk's ex-wife, Marsha Chamberlain, made her initial report to the police and petitioned for a 302 mental health warrant through the Lebanon County Crisis Center, she stated that Mr. Shirk said that he was leaving for Virginia to go to his son's residence to drop off presents for his granddaughter and that *he would not be coming home*. After the police received this information, they put out a BOLO, interpreting the statement that Mr. Shirk would not be coming home to mean that he would commit "suicide by cop." Never once did Mr. Shirk say those words and, in context, he made

5

those statements after an argument with his wife, telling her that he would not be returning to the home where they lived.

While the need for safety in the law enforcement community is certainly understandable, Mr. Shirk never stated nor did he intend that he would engage law enforcement in such a way that they would be required to kill him. While it is noted that this objection does not affect Mr. Shirk's sentencing guidelines, Mr. Shirk would submit a Motion to Strike any reference in the PSR to "suicide by cop," as it may affect his status in the Bureau of Prisons.

### III.   Motion for Downward Departure pursuant to USSG §5H1.1 - Aberrant Behavior

#### a. Mr. Shirk's age is a reason to depart downward pursuant to U.S.S.G. § 5H1.1.

Pursuant to U.S.S.G. § 5H1.1, Mr. Shirk's age is a reason to depart downward in this case. More specifically, Mr. Shirk is elderly, infirm, and he has suffered through inadequate medical treatment while in Pre-Trial detention. As indicated in Paragraphs 35-39 of the PSR, Mr. Shirk has been hospitalized multiple times and is continually exposed to COVID-19, despite a number of comorbidity conditions. Even to this date, he was moved to Allegheny County Prison, contracted COVID-19, and is now housed at the prison with over 100 other prisoners who also have COVID-19.

#### b. The fact that the offense involves aberrant behavior warrants a downward departure pursuant to U.S.S.G. § 5K2.20.

6

Because this offense clearly involves aberrant behavior, a downward departure is warranted pursuant to U.S.S.G. § 5K2.20. U.S.S.G. § 5K2.20 provides that a downward departure may be warranted in an exceptional case if the defendant committed a "single criminal occurrence or single criminal transaction that was committed without significant planning, was of limited duration, and represents a marked deviation by the defendant from an otherwise law-abiding life."

According to Application Note 3 U.S.S.G. § 5K2.20, in determining whether to depart under this section, the court may consider the defendant's mental and emotional conditions, employment record, record of prior good works, motivation for committing the offense, and efforts to mitigate the effects of the offense. *See United States v. Castano-Vasquez*, 266 F.3d 228 (3d. Cir. 2004) (holding that in determining whether a particular case is extraordinary, the court may consider the five factors delineated in Application Note [3]).

The Third Circuit has indicated that the defendant's conduct must be "spontaneous" and "thoughtless" in order to qualify for an aberrant behavior departure. *See United States v. Paster*, 173 F.3d 206 (3d Cir. 2001) (holding that the district court properly focused on whether the offense was "thoughtless," which is a "necessary ingredient" of aberrant behavior). In *United States v. Dickerson*, the Third Circuit ruled that a drug offense involved a fair amount of planning that took place over several weeks, and therefore, the defendant's behavior did not qualify as aberrant. *United States v. Dickerson*, 381 F.3d 251 (3d Cir. 2004).

7

In addition to whether there was significant planning, the length of time the conduct continued is important. *See United States v. Smith*, 387 F.3d 826 (9th Cir. 2004) (reversing district court's refusal to grant an aberrant behavior departure where the burglary lasted only five (5) to ten (10) minutes and did not involve significant planning); *United States v. Altman*, 48 F.3d 96 (2d Cir. 1995) (finding embezzlement over a long period of time was not a single aberrant act); *United States v. Premachandra*, 32 F.3d 346 (8th Cir. 1994) (holding that two (2) armed bank robberies one (1) year apart were not a single act of aberrant behavior).

While a defendant's status as a first-time offender is not sufficient by itself to justify an aberrant behavior departure, when other factors are present, the departure may be appropriate. *See United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (upholding aberrant behavior departure where the defendant had been law abiding until age 35 when his marriage disintegrated).

Here, Mr. Shirk's offense was committed without significant planning, was of very limited duration, and represents a marked deviation by Mr. Shirk from an otherwise law-abiding life. It was committed without significant planning. While Mr. Shirk made statements with respect to killing Democratic Senators as he was leaving for Alexandria, Virginia, he was also heading to visit with his son and granddaughter and, while there, planned on target shooting with his son. He did not make any plans to carry out the threat of killing Democratic Senators.

8

More specifically, many of the items found in Mr. Shirk's vehicle were consistent with his hobby of target shooting. As reflected at the time of the inventory search, two (2) of the three (3) weapons, as well as the bulk of the ammunition were contained in bins in the back of Mr. Shirk's car, which were consistent with his hobby of target shooting. Similarly, there were targets, ear and eye protection, along with rounds of ammunition, which a target shooter would regularly have to bring with him when he goes to a shooting range. When Mr. Shirk was interviewed at the hospital on these issues, Mr. Shirk noted that he routinely carried two (2) of the three (3) weapons that were in his possession.

In addition, while Mr. Shirk was committed at the Chambersburg Hospital, the FBI seized items from Mr. Shirk's briefcase, including an index card with two (2) sides, local newspapers, other notes, a phone charger, and adult diapers. However, the FBI only took note of one (1) side of the index card, which was a list he made in connection with an earlier trip he took to the shooting range. This list contains notes of guns, ammo, dope, tools, and meds. The front side of the card lists Mr. Shirk's son's name, Justin, along with a list of items he wanted to purchase, including a birthday card for Marsha, wine, a bike with 4-wheels, a cold pack, and other birthday cards for his friends and relatives.

Further, although there were some statements that Mr. Shirk had addresses of Democratic Senators, he did not have any address list and no list was ever found. So, despite making statements that he would kill Democratic Senators, Mr. Shirk was

9

merely heading to visit with his son and granddaughter and, while there, he planned on target shooting with his son.

Mr. Shirk's case is unlike *United States v. Dickerson,* in which the Third Circuit ruled that the defendant's drug offense involved a fair amount of planning that took place over several weeks, and therefore, the defendant's behavior did not qualify as aberrant. *United States v. Dickerson*, 381 F.3d 251 (3d Cir. 2004).

In applying the second requirement of U.S.S.G. § 5K2.20, Mr. Shirk's offense was also of limited duration. It is limited to making the threat to kill Democratic Senators. Mr. Shirk's case is like *United States v. Smith*, in which the court held that a departure for aberrant behavior was warranted because the defendant's burglary lasted only five (5) to ten (10) minutes. *United States v. Smith*, 387 F.3d 826 (9th Cir. 2004). To the contrary, Mr. Shirk's case is unlike *United States v. Altman*, in which the court held that the defendant's embezzlement, which occurred over a long period of time, was not a single aberrant act. Mr. Shirk's threat is limited to making a statement and his conduct did not continue past January 21, 2021.

Finally, Mr. Shirk's offense certainly represents a marked deviation by Mr. Shirk from an otherwise law-abiding life. Many factors supporting a downward departure are present beyond merely Mr. Shirk's status as a first-time offender, including, but not limited to, Mr. Shirk's, employment record and record of prior good works. As further detailed in the following section of this memorandum, all writers of character reference

10

letters unanimously state, explicitly and/or implicitly, that this offense is out of character for the Kenelm Shirk that they have come to know.

Mr. Shirk is 72 years old and had a long and successful career as a practicing attorney. He graduated from Dickinson School of Law in Carlisle in 1974, and was admitted to practice law before all courts in the Commonwealth of Pennsylvania, as well as the Federal District Court for the Eastern District of Pennsylvania, the United States Court of Appeals for the Third Circuit, and the Supreme Court of the United States. (Exhibit #2, Kenelm L. Shirk III Resume at 1).

Mr. Shirk's legal career consists of prestigious clerkships, as well as an extensive history in private practice. In 1974, Mr. Shirk was a clerk for the Commonwealth of Pennsylvania General Assembly Legislative Reference Bureau. (*Id.*). From 1975-1976, Mr. Shirk was a Law Clerk to the Honorable Glenn E. Mencer, former judge on the Commonwealth Court of Pennsylvania. (*Id.*). From 1976-1980, Mr. Shirk was an associate attorney at Shirk, Reist, & Buckwalter (Shirk, Reist, & Posey), and from 1980-1991, he was a partner of Shirk, Reist, & Posey, as well as a managing partner of the Ephrata branch of the firm. (*Id.* at 2). From 1991 to 2016, Mr. Shirk was a partner and managing partner of Kenelm L. Shirk, III Law Offices; Shirk & Ermolovich, L.L.P.; and Shirk & Mejia, L.L.P. (*Id.*). From 2016 to 2021, Mr. Shirk was a sole proprietor at Shirk Law Associates. (*Id.*).

Mr. Shirk has been a member of the Lancaster and Pennsylvania Bar Associations from 1976 until 2021, as well as a member of the American Bar

11

Association from 1976 until 2016. (*Id.* at 1). He a member of at least nine (9) different sections of both the Pennsylvania Bar Association and the Lancaster Bar Association, as well as six (6) sections of the American Bar Association. (*Id.* at 3-4). He was also a member and the vice chair of the Professional Liability Insurance Committee of the Pennsylvania Bar Association, and heavily involved in the Young Lawyers Division of the Pennsylvania Bar Association. (*Id.* at 5).

In addition to practicing law, Mr. Shirk was a Pennsylvania Licensed Title Insurance Agent from 1980 to 2012. (*Id.* at 2). He was also a Notary Public for the Commonwealth of Pennsylvania from 1993 to present day. (*Id.*).

Mr. Shirk served as the Solicitor of the Borough Council in Akron, Pennsylvania for over 28 years. He also served on the Ephrata Regional Advisory Board of Farmers First Bank and Susquehanna Bank from 1979 to 2002, as well as the Lancaster County Eastern Advisory Board of Farmers First Bank from 2002 to 2004, at which time the board was dissolved. (*Id.* at 2). He served in various positions on these boards, including member, assistant secretary, and secretary. (*Id.*).

Mr. Shirk was also involved in several other organizations. He has been a member of the Pennsylvania State Association of Township Supervisors since 1980, as well as a member of the Pennsylvania State Association of Boroughs since 1990. (*Id.* at 2-3). Mr. Shirk served in many different positions of the Ephrata Area Chamber of Commerce since 1976, including a director on the board, the first and second vice president, the president, and the state counselor. (*Id.* at 3). He was a member of the

Ephrata Downtown Revitalization (Economic Development Board) from 1989 to 1992, and eventually served as vice president and president. (*Id.* at 3-4). He was a committee member of Downtown Ephrata, Inc., as well as a chair of the zoning subcommittee within the corporation, from 2003 to 2007. (*Id.* at 4).

Mr. Shirk has been involved in the Ephrata Lions Club since 1997 as a member, the chair of the program committee and special programs committee, and the membership committee. (*Id.* at 5). He was a member of the Board of Directors of the Lancaster County Private Industry Council, as well the chairperson of the Purchasing Committee within the board. (*Id.*). Since 2000, he was on the Board of Directors of Kellers Cemetery of Springville, and in 2006, he became the President. (*Id.* at 6). Mr. Shirk was also heavily involved in assisting the Ephrata Pioneer Fire Department.

Mr. Shirk has also been involved in the American Planning Association—Pennsylvania Chapter, the Blackstonian Club, the BPOE Ephrata Lodge, the Ephrata Public Library, the Westpointe Ridge Condominium Association, and the Commonwealth Court Historical Society. (*Id.* at 6). He has also been a regularly attending member St. Peter's Evangelical Lutheran Church, as well as the chair of the Business Persons Breakfast Committee and a member of the Constitution and Bylaws Committee. (*Id.*). He was always actively involved in various fundraising events at the church as well. (*Id.*).

Mr. Shirk has no criminal history and this incident was the first time he had ever been arrested in an otherwise law-abiding life. In fact, even after committing the instant

13

offense, Mr. Shirk continued to be a law-abiding citizen. On May 12, 2021, following the instant offense, Mr. Shirk submitted a Verified Statement of Resignation with the Supreme Court of Pennsylvania, and was disbarred on consent from the Bar of the Commonwealth. (*See* Attachment #1, Per Curiam Order, to be included with submission to probation officer). As reflected in Paragraph 34 of the PSR, Mr. Shirk's sister Kate Gonick, a practicing attorney in Lancaster, notes that this conduct is completely out of character for Mr. Shirk.

Similarly, several people have provided character reference letters on Mr. Shirk's behalf in which they also explain that Mr. Shirk's conduct in this case is not representative of the person they know Mr. Shirk to be.

Mr. Shirk also has no history of violence. In fact, following the instant offense, on April 27, 2021, Mr. Shirk underwent a psychological evaluation to ascertain whether Mr. Shirk presents a danger to himself or others. (Attachment #2, Psychological Evaluation, to be included with submission to probation officer). Dr. Steven K. Erickson concluded that Mr. Shirk's risk to the public is low and that the events leading to Mr. Shirk's arrest were an isolated incident of behavior for Mr. Shirk, which was exasperated by his consumption of alcohol. He also concluded that Mr. Shirk is likely to follow any conditions placed upon him if released into the community, considering the fact that Mr. Shirk was a lawful member of the community until the instant offense.

Because this incident is clearly aberrant behavior, a downward departure is warranted.

14

### c. Section 3553(a) Factors

#### i. History and Characteristics of the Defendant

Kenelm Lawrence Shirk III was born on August 18, 1949, in Lancaster, Pennsylvania, to the marriage of Kenelm and Romaine Shirk. (PSR at ¶ 31). Both of Kenelm's parents are deceased, but he has (1) sister, Kathie Shirk-Gonick (age 68) of Lancaster, and one (1) brother, Kraig Shirk (age 65) of Pagosa Springs, Colorado. (*Id.*). Kenelm had a wonderful childhood and was raised in a traditional family. (*Id.*). His father was employed as an attorney and his mother was a homemaker. (*Id.*).

In August 1971, Kenelm married Grace Sabatine (age 73) in Lancaster, and the couple share one (1) son, Justin Shirk (age 42) of Alexandria, Virginia. (*Id.* at ¶ 31). Kenelm and Grace divorced in 2004. (*Id.*). In May 2007, Kenelm married Marsha Chamberlain (age 68) in Manheim Township, but the couple divorced in 2019, continuing to live together until the instant offense. (*Id.* at ¶ 33).

Kenelm graduated from Ephrata High School in 1967, and subsequently earned a Bachelor of Arts degree in History from Washington and Lee University in Lexington, Virginia, in 1971. (*Id.* at ¶¶ 45-46). In 1974, Kenelm earned a Juris Doctor degree from Dickinson School of Law in Carlisle. (*Id.* at ¶ 47). After passing the bar exam, Kenelm was a legal clerk, a partner of several law firms, and was eventually a sole proprietor, specializing in civil, business, estate, and municipal law. (*Id.* at ¶ 48; *see also* Attachment 1, Kenelm L. Shirk, III Resume at 1-2).

15

Kenelm has quite a significant list of medical conditions. He was diagnosed with prostate cancer in 2019, for which he underwent surgery and became cancer-free in 2021. (PSR at ¶ 35). Kenelm presently suffers from the following conditions: neoplasm of prostate and subsequent incontinence (following the removal of his prostate in May 2019); a nodule in his lower left lung; osteoarthritis in his back and hands; acute insomnia and sleep apnea; gastric antral vascular ectasia ("GAVE") syndrome; periodic asthma; anemia; hiatal hernia; diverticulitis; alpha thalassemia; atrial fibrillation; a heart murmur; cataracts; high blood pressure; vertigo; tinnitus; and two (2) torn rotator cuffs. (*Id.* at ¶ 36). Kenelm has been hospitalized seven (7) times since being detained, for either a stroke or a heart condition. (*Id.* at ¶ 35).

On October 7, 2021, Kenelm had a lesion removed from his scalp at WellSpan Plastic Surgery in Chambersburg and was subsequently diagnosed with squamous cell carcinoma in-situ. (*Id.* at ¶ 37). On October 21 and 24, 2021, Kenelm was treated at Chambersburg Hospital for rapid heart rate and dizziness and was subsequently admitted to the emergency department on October 25, 2021. (*Id.* at ¶ 38). He underwent a cardiac catheterization and was discharged on October 27, 2021. (*Id.*). On November 19, 2021, Kenelm was admitted to Chambersburg Hospital after presenting to the emergency department for shortness of breath, irregular heartbeat, and acute bronchitis due COVID-19 infection, and was discharged on November 29, 2021. (*Id.* at ¶ 39).

Kenelm is prescribed various medications for his health conditions, including aspirin, Multaq, amlodipine besylate, losartan-HCTZ, alprazolam, doxylamine

succinete, sertraline, tramadol, atorvastatin, Zantac, Nexium, montelukast, fluticasone, propionate nasal spray, ipratropium bromide spray, albuterol sulfate, valacyclovir, injective iron, Cialis, medical marijuana, and Miralax. (*Id.* at ¶ 36).

As for Kenelm's mental and emotional health, he was involuntarily admitted to the Chambersburg Hospital on January 21, 2021, in connection with this offense, but it was ultimately determined that there was not a reason to uphold the involuntary commitment and Kenelm was released on January 22, 2021. (*Id.* at ¶ 40). However, Kenelm admits that for seven (7) or eight (8) days surrounding the time he committed the instant offense, he was completely "out of it." (*Id.* at ¶ 41). He also states that he did contemplate suicide approximately 30 years ago after an argument with his then-wife. (*Id.*).

Kenelm began drinking alcohol at 16 years old, last doing so when he was arrested for the instant offense. (*Id.* at ¶ 42). He drank two (2) glasses of wine every day after work with no negative consequences. (*Id.*). He also began smoking marijuana at age 20, but rarely used it until he was prescribed medical marijuana in 2020. (*Id.* at ¶ 43).

Several people have provided character reference letters on Kenelm's behalf. E. Richard Young Jr. has known Kenelm since Fall 1965, when Kenelm was a senior in high school and Mr. Young was in seventh grade, as Kenelm served as the manager of Mr. Young's father's football team. (Attachment #3, E. Richard Young Jr. Letter). Mr. Young practiced law in the Lancaster community with Kenelm and explains that Kenelm's advice was well-thought out and insightful. (*Id.*). Mr. Young joins Kenelm's

sister, Kate, in stating that Kenelm's conduct in this case is out of character for the person that Mr. Young has known. (*Id.*).

Thomas Murray met Kenelm over 28 years ago when Mr. Murray joined the Borough Council, and Mr. Murray explains that Kenelm served the council in a very professional manner throughout those 28 years. (Attachment #4, Thomas J. Murray Letter). Mr. Murray describes Kenelm as even-tempered and one who answered questions from other council members and the public with respect. (*Id.*).

Lee Huyett, an accountant, became the accountant for Kenelm's law firm in the 1980s, and explains that Kenelm always "crossed his t's and dotted his i's." (Attachment #5, Lee Huyett Letter). Despite the fact that Mr. Huyett is surprised by Kenelm's instant offense, he still believes that Kenelm is a good person who regrets what he did. (*Id.*).

Reverend Craig Ross, the senior pastor at St. Peter's Evangelical Lutheran Church, attests that Kenelm was a faithful and committed member of the church when he attended for over ten (10) years. (Attachment 6, Rev. Craig A. Ross Letter). He states that Kenelm was generous without being ostentatious and committed to his faith without being pompous. (*Id.*).

Daniel Mentzer, a fellow member of Kenelm's on the Regional Board of Directors of Farmers First Bank, explains that Kenelm never hesitated to help the other members of the board with the technical aspects at their meetings. (Attachment 7, Daniel Mentzer Letter). Mr. Mentzer describes Kenelm as very helpful and professional to whoever he met. (*Id.*).

18

James Kiefer (Jim), President of the Ephrata Pioneer Fire Company, explains that, while he does not condone Kenelm's actions, that they do not represent the person he has known for over 30 years, as it is completely out of character. (Attachment 8, James M. Kiefer Letter). Jim tells that Kenelm served as the fire company's solicitor and often worked outside of his normal business hours and at no cost. (*Id.*). He implores the court that consider the good and positive things Kenelm has done in his life. (*Id.*).

Kraig Shirk, Kenelm's younger brother, states that Kenelm has always been a good older brother to him, describing him as thoughtful, kind, and a good uncle to Kraig's two (2) daughters, as he always remembers their birthdays with cards and phone calls. (Attachment 9, Kraig L. Shirk Letter). Kraig describes Kenelm as a good father to his son, Justin, and a good grandfather to his grandchildren. (*Id.*). He also joins many of the other character references who describe Kenelm's conduct as unbelievably out of character for him. (*Id.*).

Kathie Gonick, Kenelm's sister, explains that Kenelm was well-respected in Ephrata, serving on many organization boards and participating in service organizations, and he built his law practice representing municipalities, developers, and members of the community from all walks of life. (Attachment 10, Katie Shirk Gonick Letter). Kate explains that Kenelm handed out crosses to people with whom he engaged, bought dinners for those in need during the holidays and never forgot a birthday or anniversary for any family member. (*Id.*).

Peter Klinefelter has known Kenelm since high school and explains that during their long friendship, Kenelm has always respected and fulfilled his responsibilities to others in his life and his community. (Attachment 11, Peter Klinefelter Letter). He explains that he cannot recall any incidents or suggestion of aggression or violence in Kenelm's behavior. (*Id.*). He does not find Kenelm's behavior remotely consistent with any statements or behavior he has observed during the long time he has known him. (*Id.*).

Daniel Guers, a veteran of the United States Army and United States Navy, began a 20-year friendship with Kenelm in 1997 when Mr. Guers became the Borough Manager of Akron, PA. (Attachment 12, Daniel Guers Letter). Mr. Guers describes experiences that he had with Kenelm while working in municipal government, and describes Kenelm as someone who uses good judgement, analytical in his thinking, authentically compassionate about his clients, respected by his peers, and someone who had the trust and confidence of Borough Management. (*Id.*). Mr. Guers tells of a time that Kenelm won a new car through a raffle done by the "Downtown Ephrata" organization and then sold it to donate the money back to Downtown Ephrata. (*Id.*).

Gray Shirk, Kenelm's ex-wife and mother of their son, Justin, describes Kenelm as a good husband, great dad, and excellent attorney. (Attachment 13, Gray Shirk Letter). Ms. Shirk describes Kenelm as a man of his own who did not need a lot of attention or friends, but the friends he had were fond of him. (*Id.*).

Finally, Justin Shirk, Kenelm's son, describes his father as hardworking, as Justin vividly remembers the long hours Kenelm would work when Justin was just a child, and states that his dedication is unwavering. (Attachment 14, Justin Shirk Letter). Justin boldly states that Kenelm is not a superficial man, but deep in every way, as he cared deeply about others and donated his time and money to charitable causes for decades. (*Id.*). Justin explains his father's strong faith in God, as well as his unwavering love of the United States. (*Id.*).  Justin believes that Kenelm never wanted to harm anyone, as he had never tried to hurt anyone throughout his life. (*Id.*).

### ii.  Nature and Circumstances of the Offense

As previously explained, while Mr. Shirk's offense is not to be taken lightly, it should be considered in the context of its occurrence. Mr. Shirk made a threat to kill Democratic Senators, but he did not have the intent to carry out the threat. Mr. Shirk was not feeling like himself in the days leading up to the offense, and his wife, Marsha, and he had been arguing over politics in the recent past leading up to the offense. However, Mr. Shirk never intended to harm anyone, and has never harmed anyone in the past.

Mr. Shirk was taken into custody without incident by the Pennsylvania State Police on the 302 warrant at a local Sheetz gas station and was cooperative at the Chambersburg Hospital. Mr. Shirk was asked numerous times if he had suicidal ideations, which he repeatedly denied, and specifically denied an intent to harm anyone. Prior to this incident, Mr. Shirk had been a law-abiding citizen for 72 years. Not only

was Mr. Shirk law-abiding, but he was a pillar of his community who was heavily involved in various community organizations as well as municipal government.

Kenelm Shirk comes before this Court and implores that his convictions be viewed in light of the circumstances of his life. Given Mr. Shirk's education and long and successful career as a practicing attorney, his significant involvement in community organizations and the community, his medical conditions, and continuing support from his family, a downward variance is suggested.

IV.   **Conclusion**

**WHEREFORE**, for the reasons set forth above, Mr. Shirk respectfully requests This Honorable Court consider the foregoing information submitted herein and impose a sentence of time served.

Respectfully submitted,

**ABOM & KUTULAKIS, L.L.C.**

Date: June 6, 2022

/s/ _____
John A. Abom, Esquire
Attorney I.D. No. 77961
2 West High Street
Carlisle, PA 17013
(717) 249-0900
(717) 249-3344 Fax
*Attorney for Kenelm Shirk II*

## **CERTIFICATE OF SERVICE**

AND NOW, this 6th day of June, 2022, I, John A. Abom, Esquire, of ABOM & KUTULAKIS, L.L.C. hereby certifies that I did serve a true and correct copy of the foregoing Pre-Sentencing Memorandum via ECF addressed to the following:

Jaime.Keating@usdoj.gov


Respectfully submitted,

**ABOM & KUTULAKIS, LLC**


Date:  June 6, 2022             /s/_____
                               John A. Abom, Esquire