IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | 1:21-CR-00017 |
| | : | |
| v. | : | (Judge Wilson) |
| | : | |
| **KENELM SHIRK, III**, | : | (Electronically Filed) |
| Defendant. | : | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by its undersigned counsel, submits the following in support of its position that the defendant, Kenelm Shirk, III, should receive a guideline sentence of 18 months, a fine within the guidelines, and a term of supervised release of 1 year, with conditions.

## Procedural and Factual Background

On January 21-22, 2021, the events that led to the defendant's conviction took place. On January 22, 2021, the defendant was charged by the Pennsylvania State Police in a single count Criminal Complaint on the state charge of Terroristic Threats, in violation of 18 Pa.C.S.A. § 2706. On February 3, 2021, the Grand Jury indicted the defendant for threatening to murder a United States official, in violation of 18 U.S.C. § 115(a)(1)(B).

On December 7 and 8, 2021, this Honorable Court accepted evidence and testimony concerning the defendant's pretrial motions. Doc. 72. On December 8, 2021, this Honorable Court denied the defendant's motion for reconsideration of pretrial detention. Doc. 66. The defendant has been in custody since his arrest on January 22, 2021.

On January 10, 2022, this Honorable Court ruled on the defendant's motions. Doc. 70. On March 7, 2022, the defendant pleaded guilty, and a Pre-Sentence Report was ordered. Doc. 78. Sentencing in this matter is scheduled for June 10, 2022.

## Discussion

### I. APPLICABLE LEGAL STANDARD

The Third Circuit has articulated a three-step process in determining the appropriate sentence to impose on a defendant. *United States v. Wise*, 515 F.3d 207, 216 (3d Cir. 2008). A court must begin by correctly calculating the initial applicable Guidelines range. *Gall v. United States*, 128 S.Ct. 586, 596 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the

initial benchmark.") Second, the court must resolve any requested departures from the sentencing guidelines. *Wise*, 515 F.3d at 216. Finally, the court must make an individualized assessment of the defendant through a rational and meaningful consideration of the factors articulated in 18 U.S.C. § 3553(a) and determine a sentence. *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009). *See United States v. Booker*, 543 U.S. 220, 261, (2005); *United States v. Cooper*, 437 F.3d 324, 326-27 (3d Cir. 2006).

### A. Step One – Guideline Calculation

In the instant case, it appears that the guideline range should be 18 to 24 months imprisonment. Under the Sentencing Guidelines, the base offense level for this offense is 12. *See* UNITED STATES SENTENCING COMMISSION, GUIDELINES MANUAL, (USSG) § 2A6.1(a)(1). A six level increase is appropriate because the offense involved conduct evidencing an intent to carry out such threats. USSG § 2A6.1(b)(1).[1] In the PSR, a two level increase was included because the offense involved more than two threats: one made to his ex-wife regarding Democratic Senators, and one

---

[1] The defendant has withdrawn his objection to this increase.

3

made to a nurse regarding Democratic Senators and one about his wife.  USSG § 2A6.1(b)(2)(A).

In the Application, it states that threats made before or during the offense are to be included as relevant conduct if they have a substantial and direct connection to the offense.  USSG § 2A6.1, comment. (n.1).   It appears that there was a conscious exclusion of threats made after the offense.  The undersigned counsel sought input from the United States Sentencing Commission Helpline which advised that there was a change to the commentary to exclude threats made after the offense.  Based on that information, the undersigned counsel reviewed the medical records and the Suppression Hearing Transcript.  The defendant's statement in the hospital regarding his ex-wife was made after his statement about Democratic Senators.  Therefore the two-level increase under USSG § 2A6.1(b)(2)(A) appears to be inapplicable.

With acceptance of responsibility, the levels should be decreased by three levels.  USSG § 3E1.1(a).  It appears that the defendant will be seeking a variance based on various

circumstances. The defendant has a criminal history category of I, as indicated by the PSR. USSG § 5A. As a result, it appears that the guideline range should be 18 to 24 months imprisonment. *Id.*

### B. Step Two – Departures

After determining the initial guideline range, Third Circuit precedent instructs courts to conduct a second step. *Wise*, 515 F.3d at 216. The second step requires courts to 'formally rule on the motions of both parties and state on the record whether [it is] granting a departure and how that departure affects the Guidelines calculation.'" *Id.* In this case, neither party is seeking a departure.

### C. Step Three – Consideration of Section 3553(a) Factors

The government submits that based on the factors set forth in 18 U.S.C. § 3553(a), the guideline sentence of 18 months in prison is warranted. This recommendation considers, the amount of time the defendant has served and the potential for "good-time" credit. Such a sentence is "sufficient, but not greater than necessary," to achieve the objectives set out in 18 U.S.C. § 3553(a)(2). The most relevant factors in this case are:

1. <u>The nature and circumstances of the offense</u>

The nature and circumstances of this offense are such that a sentence within the Guidelines is appropriate. This was a very serious situation in which the defendant told his ex-wife that he was leaving to kill Democratic members of the United States Senate. On January 21, 2021, the defendant loaded his car with several firearms, scores of magazines, and hundreds of rounds of ammunition. Because of the defendant's actions, multiple national, state, county, and municipal agencies from Lebanon County Pennsylvania to Washington D.C. scrambled throughout the Commonwealth to confront this potentially unstable individual possessing loaded firearms. The defendant put every responding law enforcement officer in danger of confronting him with deadly force. Keep in mind that this was a little over two weeks after the January 6, 2021, Capitol riots and events in Washington D.C.

Authorities finally found the defendant at a public gas station. The defendant's vehicle was at a pump, and the

defendant was exiting the building walking towards his vehicle. Based on the threats the defendant made and the preparations the defendant took, the police faced a potentially explosive engagement at a public place, in the vicinity of gas pumps. This was an inherently dangerous situation regardless of whether the defendant actually uttered the words "suicide by cop."

It is not as if the defendant did not have time to calm down, reconsider things, call his ex-wife, reach out to his son or any one of the many well-meaning supporters who wrote a letter on his behalf to help defuse the situation. The defendant had resources of support as his disposal. The defendant was encountered approximately an hour and half from his home. The defendant had a working cell phone. Instead, the defendant stopped, refueled and was ready to proceed to his objective. It was through the intervention of the Cornwall Borough Police Department, Lebanon County Mental Health Crisis, and the Pennsylvania State Police from both Carlisle and Chambersburg barracks that the defendant did not reach his objective.

A review of the defendant's conduct at the hospital is important. Based on his statements, actions, and a warrant, the police took the defendant from the gas station to the hospital for a mental health evaluation. If things had merely gotten out of hand with his ex-wife, the defendant would have disclosed that to the nursing staff, taking the opportunity at the hospital to pause, reflect, and de-escalate the situation. Instead, the defendant doubled down, by repeating the threat to kill and expounding on the details. Hours later, he told the doctor, who could release him, that this situation was overblown and taken out of context. The defendant wants his Sentencing Court to believe the same thing.

While making small talk with the defendant, the nursing staff asked the defendant where he was going. Doc. 72 p. 182. The defendant's professed intent to see his granddaughter did not make sense with regard to his arrival time. *Id*. at 183. If the defendant were released from the hospital, and drove directly to Alexandria Virginia, he would arrive at a very early hour. Doc. 72 p. 182. The nurse confronted the defendant with the fact that he would arrive "very very early in the morning" when his

granddaughter and son would be asleep. *Id.* The defendant responded that he wanted to "get there on time." Doc. 72 p. 183. It is reasonable to conclude that at four o'clock in the morning, defendant had plans in addition to dropping off presents. It is also reasonable to conclude his plans did not include going to a shooting range at four o'clock in the morning, as he claimed. The defendant told the nurse what his plans were.

The defendant told the nurse that he wanted to get there early enough to kill Democratic Senators on their lawns when they were leaving for work. Doc. 72 p. 183. In fact, he was mindful of the Washington D.C. area traffic. Doc. 72 p. 183. The defendant said that he compiled a list of names and addresses of his targets. Doc. 72 p. 186. This statement was made at approximately 11:00 p.m., approximately four hours <u>after</u> the original call was placed to the 911 center. Doc. 72 pp. 72, 138.

The defendant made this statement well after a several hour span of time that allowed for a cooling off period. We know that while in the hospital, the defendant was not under the influence of any alcohol or drugs that could have affected his ability to

9

communicate. Doc. 72 p. 176. The defendant was alert, oriented, and responded appropriately. *Id.* He did not appear to be impaired, and his speech was not slurred. Doc. 72 p. 176. Ultimately the defendant was discharged from the hospital on an involuntary commitment petition, so there were no mental deficits. Doc. 72 p. 120. An attorney versed with mental health commitment hearings, neither did the defendant have any cognitive deficits. Doc. 72 p. 174-75. The defendant's estimated time of arrival in Alexandria corresponded with the nurse's understanding of travel time. Doc. 72 p. 185. This is in direct contradiction to defendant's claims in the PSR that "he was 'completely out of it' and purportedly could not provide further explanation." PSR p. 8.

In contrast, the defendant led the doctors authorized to keep him in the hospital and the FBI, who had the perceived authority to charge him, to believe that he never made threats to kill Democratic senators to anyone. He made it seem as though his ex-wife was over-reacted and spoke in hyperbole. At the hospital, the defendant claimed he was not experiencing homicidal or

suicidal ideations. The defendant knew full well that he would not be permitted to leave, had he claimed otherwise. It is well-established that the defendant had had serious health problems and anxiety regarding his finances. PSR p. 7-8. On one previous occasion, the defendant contemplated suicide after an argument that he had with his wife. *Id.* This episode in this case, started with an argument with his ex-wife. Whether or not the defendant used the actual words "suicide-by-cop" is not the issue. Clearly, someone who knew the defendant well, called authorities out of legitimate concern that the defendant was going to hurt himself and others. As the medical records reflect, he disclosed that he previously tried to hurt himself. Doc. 72 Suppression Hearing Gov. Exhibit #3 p. 36. It appears that when he intentionally made the threat this time, he did so, at least partially, to put responders in a position that they would complete the task for him.

At this juncture it is appropriate to address the defendant's claims that he had no intent to carry out his threats. First, it is the intent to make the threat, not the threat to carry it out, that is an element of the offense. *See*, *United States v. Polanco*,

2022WL595154 (5th Cir. 2022), citing, *United States v. Stevenson*, 126 F.3d 662, 664–65 (5th Cir. 1997) (explaining, Government need only prove "threat was intentionally communicated, not that threat was credible or could be immediately carried out"). The defendant's statements are an attempt to negate the six level increase under USSG § 2A6.1(b)(1). The defendant's actions betray his words.

As mentioned, there is a six level increase if "the offense involved <u>any conduct</u> evidencing an intent to carry out such threat." USSG § 2A6.1(b)(1) (emphasis added). The defendant made the threat at the hospital to kill Democratic Senators. He specifically used the word "kill" and the phrase "Democratic Senators." He had a car full of guns, magazines, and ammunition. This was not a late night Facebook post, or an Internet comment made on a news article. He made the threat unambiguously to his ex-wife and hours later, he unequivocally repeated it to a nurse. He was not joking; he was not being sarcastic; "he was serious." Doc. 72 p. 152.

Regardless of whether he actually memorialized his list of targets, the defendant told the nurse that he made a list and knew their addresses. The defendant expressed the desire to leave the hospital to reach his location at a time inconsistent with seeing his three-year-old granddaughter or going to a public gun range. It was consistent with arriving as Alexandria residents would be emerging from their homes, to leave on their way to work, adjusting for travel time of the Washington D.C. traffic.

When asked by hospital authorities and by law enforcement authorities, the defendant directly contradicted what he told the nursing staff. Interestingly, the defendant now denies to the Probation Department ever having <u>any</u> intent to carry out the same threats he denied ever making. The defendant knows full well the gravity of the situation that he caused and is deserving of a standard range sentence.

2. **<u>The History and Characteristics of the Defendant</u>**

The defendant goes to great lengths to highlight his age, his lack of a criminal history, his status, and his medical problems. In response, the government would note, the defendant was old

enough to know better. This was not a youthful indiscretion. Nor was it a product of impairment of thinking due to advanced age. The guidelines already consider the defendant's lack of a criminal history. According to the PSR, the guideline provisions establish the range for a fine from $10,000 to $95,000 which defendant can pay. PSR p. 13. Given the tremendous amount of resources and effort expended by various government agencies reacting to the defendant's turmoil, such a fine is appropriate. The defendant's age and his status actually make his threats even more alarming. Given his stated intention along with his ability to carry out the threat through his status, the defendant's characteristics support a standard range sentence.

   3. <u>Seriousness of the Offense, Respect for the Law, and Just Punishment</u>

The seriousness of the Offense also weighs in favor of a guideline sentence as discussed. It is difficult to overlook the defendant's disrespect for the law. He literally threatened to kill the law-makers of a certain party. The remedy for dissatisfaction with members of the government is an election. The answer is not to threaten to murder them. The defendant was in a unique

position to understand this concept. He violated the very oath he took as an attorney to support the rule of law. As demonstrated by his sentencing memo, the defendant made a good career out of engaging in the practice of law. Instead of respecting the law, when confronted with his actions, the defendant flouted his knowledge of the law. Considering all of the circumstances, in this case, a sentence at the bottom of the sentencing guidelines is a just sentence.

### 4. Need for Deterrence

Hopefully the defendant requires no further deterrence from committing something like this again. There is no way to know when he will become depressed again or how he will respond. It appears therefore that a consecutive maximum period of supervised release with the standard and requested conditions should help monitor the defendant's disposition.

As it relates to deterrence to others, they need to know that actual threats coupled with <u>any conduct</u> evidencing an intent to carry out such threat will be dealt with appropriately. No doubt some will view the defendant's sentence as too harsh or too lenient

based on his political views or based on his former status as an attorney. A sentence within the guidelines, however, will demonstrate that the defendant was not treated any differently than any similarly situated defendant.

## Conclusion

WHEREFORE, the Government respectfully requests that your Honorable Court sentence the defendant, Kenelm Shirk, III, to a term of imprisonment within the guidelines, a fine within the guidelines, and a term of supervised release of 1 year with the standard and recommended conditions.

Respectfully submitted,

John C. Gurganus
United States Attorney

s/ Jaime M. Keating
Jaime M. Keating
Assistant United States Attorney
Jaime.Keating@usdoj.gov
PA Attorney ID #66726
228 Walnut Street, Suite 220
Harrisburg, Pennsylvania 17101
Phone: 717-221-4482
Fax: 717-221-4582

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | 1:21-CR-00017 |
| | : | |
| v. | : | (Judge Wilson) |
| | : | |
| **KENELM SHIRK, III**, | : | (Electronically Filed) |
| Defendant. | : | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers. That on this Wednesday, June 8, 2022, he served a true and correct copy of the foregoing

**UNITED STATES' SENTENCING MEMORANDUM**

by electronic means to:

John A. Abom, Esq.
Counsel for the Defendant
Abom and Kutulakis, L.L.C.
2 West High Street
Carlisle Pennsylvania 17013
jaa@abomkutulakis.com

June 8, 2022                             s/ Jaime M. Keating
                                         JAIME M. KEATING
                                         Assistant United States Attorney